## ANA MARIA METZGER, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6510-78. Filed April 9, 1987.

Ana Maria Metzger, pro se.
*Eugene J. Wien,* for the respondent.

CHABOT, *Judge*: Respondent determined a deficiency in Federal individual income tax against petitioner for 1975 in the amount of $1,745. By amendment to answer, respondent asserts an increased deficiency in the amount of $18,196.28, for a total deficiency in the amount of $19,941.28.

The issues for decision are as follows:

(1) Whether one-half of the $75,000 payment to petitioner from Muhlenberg College in settlement of litigation is excludable from gross income[1] under section 104(a)(2);[2]

---

[1] Petitioner included the other half of the settlement payment ($37,500) in gross income on her 1975 tax return.

[2] Unless indicated otherwise, all subtitle and section references are to subtitles and sections of the Internal Revenue Code of 1954 as in effect for the year in issue.

(2) Whether petitioner is entitled to deduct all of the amount she paid as a legal fee if a portion of the settlement payment referred to in issue (1) is excludable.

## FINDINGS OF FACT

None of the facts have been stipulated.

When the petition was filed in the instant case, petitioner's legal residence was in Allentown, Pennsylvania.

Petitioner, a woman of Cuban national origin, is a naturalized citizen of the United States. She received a Doctor of Education degree from the University of Havana.

For the academic year 1961-62, petitioner taught full time at the Instituto Pedagogico Experimental de Barquisimeto in Barquisimeto, Venezuela, an institution of higher education that grants baccalaureate degrees. Sometime thereafter, about May 19, 1966, Muhlenberg College (hereinafter sometimes referred to as the college) hired petitioner as an assistant professor of Spanish for the 1966-67 academic year. The college is a private nonprofit corporation organized under Pennsylvania law, with principal administrative offices and places of instruction located in Allentown, Pennsylvania. The college reappointed petitioner as an assistant professor of Spanish for 3 additional academic years, extending her employment through August 31, 1970. About December 15, 1969, the college promoted petitioner to the rank of associate professor of Spanish. About February 27, 1970, petitioner's contract was extended for an additional two academic years through August 31, 1972.

While at the college, petitioner taught courses in elementary and intermediate Spanish, Spanish Conversation and Composition, 17th Century Spanish Literature, 18th and 19th Century Spanish Literature, Generation of 1898 and 20th Century Spanish Literature, and Methods of Teaching Foreign Languages in Secondary Schools.

Each contract of employment between the college and petitioner was subject to the provisions of the college's charter, bylaws, and faculty handbook (hereinafter sometimes referred to as the handbook). The handbook provides as follows:

The College operates under a charter granted it by the Commonwealth of Pennsylvania and under bylaws adopted by the Board of Trustees.

Publications entitled *The Charter—The Bylaws* and *The Retirement Program* are available for reference in the Library and in various administrative offices. Personal copies may be obtained from the Office of the Dean of the College. Part of what follows in this Handbook has been excerpted from these publications. (In case of any conflict between such official documents of the College and statements in this Handbook, the former are controlling.)

Academic tenure is a system whereby faculty appointments in an institution of higher education are continued generally until retirement. At the college, the normal tenure procedure is for the head of the candidate's department to make a recommendation to the Faculty Personnel Committee (hereinafter sometimes referred to as the committee), which then makes a decision and recommendation to the president of the college. The president's decision is reviewed by the board of trustees which has final authority.[3] In practice, the recommendation of the committee, an elected body of six tenured professors, is decisive. If a faculty member fails to achieve tenure after 7 years of continuous teaching, then his or her services are terminated.

With respect to the conditions for granting tenure, article VII, section 4, of the college's bylaws, dated July 21, 1970, provides as follows:

SECTION 4. Continuous tenure shall be granted only by action of the Board of Trustees upon the recommendation of the President. A faculty member shall obtain continuous tenure upon reappointment after seven years' full-time college or university teaching at the rank of Instructor, Assistant Professor or Associate Professor, at least four of which shall have been at the College. Not more than three of the total seven years shall be served at the rank of Instructor. No persons, however, shall teach at the College for more than nine years without obtaining continuous tenure. A member who joins the Faculty with the rank of Associate Professor or Professor, upon reappointment, after a probationary period of three years shall have continuous tenure. A member of the Faculty who is promoted to Professor, if he has served four years on the Faculty, shall have continuous tenure as of the effective date of such promotion.

Termination of limited appointments or continuous tenure shall be warranted for the following reasons:

(a) Incompetence

---

[3]From Sept. 1, 1969, through the year in issue in the instant case, John H. Morey (hereinafter sometimes referred to as Morey), was president of the college. During the period of petitioner's employment with the college, he was responsible for recommending faculty members for tenure to the trustees of the college.

(b) Gross neglect of duty

(c) Immorality

(d) Demonstrable financial exigencies on the part of the College

(e) The elimination or reduction of a department.

The handbook provides that notice of nonreappointment shall be given "in writing by the President of the College * * * at least twelve months before the expiration of an appointment after two or more years of employment at the College."

By memorandum dated October 15, 1971, the head of the foreign language department recommended to the dean of the college that petitioner be granted tenure. On December 15, 1971, however, the college orally advised petitioner that she had not been recommended for tenure. Thereafter, in a memorandum dated December 16, 1971, the head of the foreign language department reiterated his position to the dean of the college that petitioner be granted tenure. Notwithstanding the department head's recommendations, the college, by letter dated February 28, 1972, officially notified petitioner that she had not been recommended for tenure and that her employment with the college would terminate when her contract expired on August 31, 1972. By letter dated March 15, 1972, Morey (1) conceded that late notice of nonreappointment had been given to petitioner (in violation of the foregoing handbook provision that notice of nonreappointment be issued 12 months before the expiration of an appointment), (2) offered to compensate petitioner for any damages suffered due to this breach of contract, (3) requested that petitioner seek other employment so as to mitigate her damages (noting that her loss could not be determined precisely until the expiration of her contract on August 31, 1972), and (4) offered to discuss with the board of trustees the possibility of offering petitioner a 1-year terminal contract with the understanding that tenure would not be secured.

By a letter dated April 26, 1972, petitioner demanded breach of contract damages from the college, claiming the following relief:

In addition to the damages for loss of salary for the academic year 1972-1973, [petitioner] is entitled to damages for loss of tenure. Since she was not terminated in accordance with [the College's] procedures and her

contract, she now has automatic tenure in accordance with the bylaws of the college as provided for in Article 7, Section 4 because the failure to terminate her employment constitutes reappointment after the seven years of college teaching including four at [the college].

[Petitioner] will be 43 years of age on September 27, 1972. Her current wages approximate $14,000.00 including fringe benefits. Her life expectancy on her 43rd birthday is 33 years. Mandatory retirement at [the College] is age 65 leaving a working life of 22 years. Her damages amount to $308,000 representing her salary for a period of 22 years. Ordinarily, this sum must be reduced to present worth but the 6% factor would be offset by the anticipated increase in the cost of living of 6% per year. In addition, she is claiming loss of tuition grants for her two children.

* * * there is no market for a Spanish professor with [petitioner's] qualifications in this area. Furthermore, [petitioner] has no obligation to mitigate her damages by obtaining employment of a menial nature. * * *

## State Court Proceeding

On April 27, 1972, petitioner initiated an action in assumpsit against the college, for breach of contract, in the Court of Common Pleas of Lehigh County, Pennsylvania (hereinafter sometimes referred to as the State court). Petitioner sought damages in the amount of $324,916.70 ($304,916.70 lost wages[4] and $20,000 lost educational benefits for her two minor children)[5] plus interest and costs from the college. Petitioner did not assert any claim for damages for personal injuries in the State court.

In response to petitioner's allegations, the college stated the following as the reasons why Morey did not recommend petitioner for tenure:

(a) The non-recommendation of the Committee;

(b) The non-recommendation of the Dean;

(c) The fact that [petitioner], as a member of the Foreign Language Department, was capable to teach only Spanish;

(d) The fact that [petitioner] evidenced difficulties and a reluctance to teach elementary Spanish[;]

(e) The hazard of locking too many people with tenure, including one of [petitioner's] limited capabilities, in the Foreign Language Department in view of the possibility of decreasing enrollment.

---

[4]This amount represents petitioner's total compensation ($13,859.85) for the academic year 1971-72 multiplied by 22, the projected number of years until her retirement.

[5]As a result of petitioner's termination of employment, petitioner's children no longer could participate in the college's tuition grant, remission, and exchange program for faculty children.

*State Commission Proceeding*

On or after July 21, 1972, petitioner filed a complaint with the Commonwealth of Pennsylvania, Governor's Office, Pennsylvania Human Relations Commission (hereinafter sometimes referred to as the State commission) against Morey, as the college's president, alleging that:

[petitioner] was dismissed as a teacher without due regard to rules respecting tenure and reappointment because of her sex and national origin, Spanish. In addition the usual twelve months' notice was not given because of her sex and national origin.

This complaint was amended to add the college as a respondent, to indicate that litigation was pending in two courts (the State court, and the Federal court, discussed *infra*), and to allege further that petitioner was denied tenure because of her ancestry (as well as her sex and national origin). Petitioner complained that the action of Morey and the college constituted a violation of section 5(a) of the Pennsylvania Human Relations Act (hereinafter sometimes referred to as the act), which in general prohibited employment discrimination on account of the race, color, religious creed, ancestry, age, or national origin of any individual. (Pa. Stat. Ann. tit. 43, sec. 955(a) (Purdon 1964).) After conciliation efforts failed, the State commission scheduled public hearings for April 1975 to determine whether the college engaged in any unlawful discriminatory practices.[6]

*Federal Commission Proceeding*

On or after June 8, 1972, petitioner filed a charge of discrimination under title VII of the Civil Rights Act of 1964 with the U.S. Equal Employment Opportunity Commission (hereinafter sometimes referred to as the Federal commission), alleging that the college, in failing to grant petitioner tenure, or at the very least, a "terminal year of teaching", discriminated against her because of her sex and national origin. On or after March 1, 1973, petitioner filed an amended charge of discrimination with the Federal commission alleging that the college had engaged in a

---

[6]As a result of the settlement reached between petitioner and the college, et al., discussed *infra*, these hearings were never held.

general pattern of sex discrimination with regard to the granting of tenure and the payment of compensation. Petitioner sought from the Federal commission reversal of the negative tenure decision, back pay, and the restoration of all fringe benefits.

On August 27, 1974, the Federal commission issued the following decision:

> There is reasonable cause to believe that [the college] has engaged in an unlawful employment practice in violation of Title VII of the Civil Rights Act of 1964, as amended, by discriminating against [petitioner] because of her sex by denying her promotion to a tenured position. There is no reasonable cause to believe that [petitioner] was denied tenure because of her national origin.
>
> There is insufficient evidence to enable the Commission to make a determination on the class allegations with respect to tenure and compensation.

*Federal Court Proceeding*

On November 25, 1974, petitioner filed a complaint against the college, Morey, certain members of the committee, and the former dean of the college, in the U.S. District Court for the Eastern District of Pennsylvania (hereinafter sometimes referred to as the Federal court), describing generally the nature of the litigation as follows:

### I. INTRODUCTION

1. This action for declaratory, injunctive and other relief is brought by [petitioner] to redress violations by the defendants [i.e., the College, et al.] of rights secured to [petitioner] by the Constitution and laws of the United States and the Commonwealth of Pennsylvania.

2. The action arises under the Thirteenth and Fourteenth Amendments to the United States Constitution, Title 42 U.S.C. §§1981, 1983, 1985(3), 1986, and 2000e, et seq., 29 U.S.C. 206(d) and Executive Order 11246 as amended by Executive Order 11375. In addition, the complaint sets forth a claim for breach of contract under the laws of the Commonwealth of Pennsylvania, as well as violations of the Pennsylvania Equal Pay Act, 43 P.S. §336.1 et seq., and the Pennsylvania Human Relations Act, 43 P.S. §951 et seq. [Petitioner] challenges a pattern of discrimination on the basis of sex and national origin in regard to conditions of employment at [the college]. She was denied reappointment and tenure at [the college] on account of such discrimination, in violation of federal and state law.

The college substantially denied these allegations.

Petitioner sought the following relief from the Federal court with regard to the Federal claims asserted: (1)

Declaratory judgments that the college, et al., violated petitioner's rights under the 13th and 14th Amendments to the United States Constitution, 42 U.S.C. secs. 1981, 1982, 1983, 1985(3), 1986, and 2000e et seq., 29 U.S.C. sec. 206(d), and Executive Order 11246, as amended by Executive Order 11375; (2) preliminary and permanent injunctions prohibiting the college, et al. (a) from engaging in a pattern and practice of discrimination on the basis of sex and national origin, (b) from denying petitioner rights secured by the above-listed constitutional provisions, statutes, and executive orders, and (c) from discriminating against petitioner in her terms, conditions, and privileges of employment; (3) preliminary and permanent injunctions requiring petitioner's reappointment as a tenured associate professor of Spanish at the college; (4) back pay, in the amount of $46,970.91, for the academic years 1972-73, 1973-74, and 1974-75, and punitive damages in the amount of $300,000; (5) reasonable attorney's fees and litigation costs; and (6) any further relief the court deems necessary and proper.

In addition, petitioner sought the following relief from the Federal Court with regard to the pendent State claims asserted under the act, the Pennsylvania Equal Pay Act, and in breach of contract: (1) A preliminary and permanent injunction requiring petitioner's reappointment as a tenured associate professor of Spanish at the college, and (2) back pay, in the amount of $46,970.91, for the academic years 1972-73, 1973-74, and 1974-75, and punitive damages in the amount of $300,000.

## Settlement

After the State commission scheduled public hearings, the college's counsel (Harry Reagan, hereinafter sometimes referred to as Reagan) and petitioner's counsel (Jack Levine, hereinafter sometimes referred to as Levine) met at the State commission's offices. It was agreed that Reagan and Levine would attempt to negotiate a settlement.

At that stage, in March 1975, the college's view of the four proceedings was as follows: the State court proceeding was "in limbo" and had been since 1972;[7] the Federal court

---

[7]Indeed, petitioner had voluntarily discontinued the State Court proceeding on Feb. 11, 1975.

proceeding had been filed "merely to create some bargaining leverage"; the Federal commission (which had earlier found reasonable cause to believe that petitioner had lost her job because of sex discrimination but not because of national origin discrimination) had stepped aside to allow the State commission to proceed; and the impending State commission hearing was what stirred the college to action.

Negotiations were carried out in terms of overall settlement numbers, and not in terms of valuations of separate claims, except that the college did consider the breach of contract claim to be viable because the college failed to offer petitioner a "terminal contract" which would have resulted in wages being paid to petitioner for 1 additional year of about $15,000 to $20,000.

In March 1975, petitioner and the college agreed that the college would pay petitioner $75,000 in settlement of the pending litigation if (1) petitioner executed appropriate release forms settling all matters, and (2) matters before the State commission and the Federal commission would be resolved by way of conciliation discussions.

That summer, Reagan and Levine began to negotiate the details of the settlement. The college preferred that the entire amount be treated as wages subject to withholding taxes, in order to protect it against any later charge that the college had failed to comply with its withholding obligations under the Internal Revenue Code. Petitioner preferred that as little be withheld as possible. They settled on a designation, "for tax purposes only," of $37,500 for wage claims, subject to withholding, and the other $37,500 for all claims other than wage claims. Thus, on September 16, 1975, petitioner and Morey, on behalf of the college, executed (1) a "General Release" providing for the college's payment of $75,000 to petitioner and for the settlement of all litigation pending before the State commission, the Federal commission, the State court, and the Federal court; (2) an indemnification agreement which was filed with the State commission and the Federal commission; and (3) a conciliation agreement settling all claims arising out of the action before the Federal commission on the payment to petitioner of $75,000. The General Release provides as follows:

## GENERAL RELEASE

KNOW ALL MEN BY THESE PRESENTS, that I, [petitioner] for and in consideration of the sum of * * * ($75,000), payment thereof being made by [the college] who, so as to avoid the cost of litigation, but who makes no admission of any liability, agrees, and [petitioner] agrees that this settles all claims and actions as between the parties hereto, do hereby remise, release and forever discharge [the college], [Morey], * * * and [certain other individuals of the college], * * * of and from all and in all manner of presently existing actions and causes of actions, suits, debts, claims and demands whatsoever in law or equity arising from or relating in any way to [petitioner's] employment relationship with [the college]; including but not limited to claims arising from the transaction which is the subject matter of [1] the Complaint filed with [the State commission] * * * including any claims arising from any alleged violations of [the Act], * * * ; [2] the charge filed with [the Federal commission] * * * , including any claims arising from any alleged violations of Title VII of the Civil Rights Act of 1964, * * * ; [3] the action filed with [the State court] * * * ; [4] the civil action filed in [the Federal court] * * * ; and [5] including all said claims which I have ever had, now have, and which I or my heirs, executors[,] administrators, successors or assigns, or any of them, hereafter can, shall or may have. By this Release, I do hereby forever waive all right to assert any claim or demand to re-employment or tenure by [the college], and do waive all right to assert any claim to any benefits of employment with [the college] accruing after August 31, 1972, including but not limited to unemployment compensation, tuition program for children and employees and retirement contributions. * * * .

## The indemnification agreement provides as follows:

### INDEMNIFICATION AGREEMENT

WHEREAS, [petitioner] has asserted against [the college] certain claims, including claims for reemployment, wages, *compensatory damages for personal injuries*, punitive damages, and reasonable attorneys' fees; and

WHEREAS, [petitioner] and [the college] have agreed to a settlement of all claims and actions as between the parties, it is understood that such settlement is made by [the college] in order to avoid the costs of litigation, and no liability is admitted.

WHEREAS, [the college], in consideration of [petitioner's] release of [the college] from all presently existing actions, causes of action, suits, debts, claims and demands, has agreed to make to [petitioner] a lump sum payment of * * * ($75,000); and

WHEREAS, the parties agree that payment by [the college] in the amount of * * * *($37,500) shall be in settlement of all wage claims* of [petitioner] and that payment by [the college] of * * * *($37,500) shall be in settlement of all claims other than those claims for wages; however, this division of payment is made for tax purposes only*, in order to satisfy Internal Revenue Rulings dealing with discrimination claim settlement, and in no way does [the college] admit, by this division, liability for wage

claims, nor shall it be construed that the proportion of payment designated as settlement of all wage claims constitutes reemployment of [petitioner] for any period after August 31, 1972; settlement has been agreed upon by [the college], as stated in the General Release, to avoid the cost of litigation, and [the college] admits no liability.

WHEREAS, the parties agree that [the college] shall withhold from the payment to [petitioner] in order to comply with the Internal Revenue Rulings with regard to withholding of taxes on discrimination claim settlements, * * * ($11,294.85) and shall make payment in the amount of * * * ($11,294.85) to the appropriate government agencies on the appropriate quarterly and year-end government withholding tax report forms in fulfillment of any and all obligations of [the college] relating to payments made to [petitioner] in settlement of the aforesaid claims.

NOW, THEREFORE, the parties hereto mutually agree as follows:

[Petitioner] shall assume all responsibility for and shall protect, indemnify and hold harmless [the college] against and from any and all claims, losses, damages, liability, suits, actions, judgments, costs, penalties, and expenses, including but not limited to reasonable attorneys' fees and litigation expenses, resulting from any liability or claim of liability for the payment or withholding of amounts assessed or due to any federal, state, or local government or agency thereof in payment of any obligation of [the college], including but not limited to federal withholding taxes and social security taxes, resulting from the payment of the aforesaid * * * ($75,000) to [petitioner]. * * *

[Emphasis added.]

The conciliation agreement provides, in pertinent part, as follows:

### SECTION I. *General Provisions*

\*   \*   \*   \*   \*   \*   \*

2. It is understood that this Agreement does not constitute an admission by [the college] of any violation of Title VII of the Civil Rights Act of 1964, as amended, and that this Agreement is being entered into by [the college] to avoid the expense of litigation.

3. [Petitioner] and the [Federal commission] hereby waive, release and covenant not to sue [the college] with respect to the matters which were alleged or might have been alleged as charges filed with the [Federal Commission] subject to performance by the [college] of the promises and representations contained herein.

### SECTION II. *Charging Party Relief*

The [college] agrees to pay to [petitioner], in full and final settlement of all claims arising out of this case * * * ($75,000) less appropriate tax withholdings.

[Petitioner] agrees to accept from the [college] in full and final settlement of all claims arising out of this Case * * * the sum set forth above. [Petitioner] also waives any rights to reinstatement to the employ of the [college].

On September 18, 1975, the suit in the Federal court was dismissed with prejudice, pursuant to agreement of counsel that a settlement had been reached. By letter dated October 3, 1975, the State commission advised petitioner that her case had attained inactive status as a result of the settlement agreement reached between petitioner and the college. On that same date, the State commission sent a similar letter to the college.

In 1975, petitioner received a check in the amount of $63,705.15, which amount represented the settlement payment of $75,000, less deductions for Federal withholding tax, State and local withholding tax, and social security taxes (FICA).

In 1975, petitioner paid a fee of $7,750 to Levine for his services in this matter.

On her 1975 Federal income tax return, petitioner reported as income $37,500 of the settlement payment received from the college; she deducted on Schedule A, as an employee business expense, the entire $7,750 legal fee.

---

The settlement payment was made on condition that petitioner release her claims against the college based on (1) breach of contract, (2) discrimination on account of sex and national origin in violation of petitioner's rights under the 13th and 14th Amendments to the United States Constitution, 42 U.S.C. secs. 1981, 1982, 1983, 1985(3), 1986, and 2000e et seq., 29 U.S.C. sec. 206(d), and Executive Order 11246, as amended by Executive Order 11375, and (3) discrimination on account of sex and national origin in violation of petitioner's rights under section 5(a) of the Pennsylvania Human Relations Act.

Not less than $37,500 of the settlement payment constituted damages on account of personal injuries to petitioner.

OPINION

Respondent contends that the entire $75,000 settlement payment is includable in gross income, and that no part of that amount is excludable under section 104(a)(2), because "No amount * * * was paid on account of either personal injuries or sickness." Respondent contends further that, if any part of the settlement payment is excludable, then a proportionate part of the $7,750 legal fee is not deductible.

Petitioner maintains that the settlement payment was made in settlement of all claims against the college, et al., including those claims in which petitioner alleged violations of her right to be free from discrimination on the basis of sex and national origin. Petitioner argues that these violations resulted in personal injuries to her for section 104(a)(2) purposes. She contends that one-half of the settlement payment was allocated in the indemnification agreement to compensate her for personal injuries and so one-half is excludable from income. Petitioner asserts further that she is entitled to deduct the total legal fee because it "was chargeable solely to that part of the recovery received from [the college] which was intended to compensate her for lost earnings, past and future," and not to that portion of the settlement payment that compensated her for her personal injuries.

We agree with petitioner as to the excludability issue, and with respondent as to the deductibility issue.[8]

## I. *Exclusion of Settlement Payment*

Section 61(a)[9] states that, except as otherwise provided, gross income means "all income from whatever source derived". Section 104(a)(2)[10] provides otherwise, in that it

---

[8]Respondent's determinations as to matters of fact in the notice of deficiency, relating to the deduction for the legal fee, are presumed to be correct and petitioner has the burden of proving otherwise. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. However, respondent has the burden of proof with respect to the excludability issue and the resulting additional deficiency asserted in the amendment to answer. *Reiff v. Commissioner*, 77 T.C. 1169, 1173 (1981).

[9]Sec. 61(a) provides, in pertinent part, as follows:

SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle [i.e., subtitle A, relating to income taxes], gross income means all income from whatever source derived * * *

[10]Sec. 104(a) provides, in pertinent part, as follows:

SEC. 104. COMPENSATION FOR INJURIES OR SICKNESS.

excludes from gross income damages received on account of personal injuries or sickness. However, the Internal Revenue Code of 1954 does not explain what a taxpayer must show in order to prove that the damages were received "on account of personal injuries." *Seay v. Commissioner*, 58 T.C. 32, 36 (1972).

Section 1.104-1(c), Income Tax Regs., provides that "The term 'damages received (whether by suit or agreement)' means an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort-type rights, or through a settlement agreement entered into in lieu of such prosecution"; thus, it is not necessary that the damages be on account of physical trauma. *Church v. Commissioner*, 80 T.C. 1104, 1106 (1983).[11] The essential element of an exclusion under section 104(a)(2) is that the damages must derive from some sort of tort (or tort-type) claim against the payor. *Glynn v. Commissioner*, 76 T.C. 116, 119 (1981), affd. without published opinion 676 F.2d 682 (1st Cir. 1982); sec. 1.104-1(c), Income Tax Regs.

Section 104(a)(2) encompasses situations where the damages received are "by suit or agreement". In the context of a settlement agreement, determining the exclusion from gross income depends on the *nature* of the claim which was the actual basis for settlement, not the *validity* of the claim (*Seay v. Commissioner*, 58 T.C. at 37), the proper inquiry being in lieu of what were damages awarded. *Church v. Commissioner*, 80 T.C. at 1107; *Yates Industries, Inc. v. Commissioner*, 58 T.C. 961, 972 (1972), affd. without published opinion 480 F.2d 920 (3d Cir. 1973). If the settlement agreement lacks express language stating that the payment was (or was not) made on account of personal injury, then the most important fact in determining how section 104(a)(2) is to be applied is "the intent of the payor" as to

---

(a) IN GENERAL.—Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include—

        \*     \*     \*     \*     \*     \*     \*

  (2) the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness;

[The subsequent amendment of this provision by sec. 101(a) of Pub. L. 97-473, 96 Stat. 2605, does not apply to the instant case.]

[11]See Stephen, "Federal Income Taxation and Human Capital", 70 Va. L. Rev. 1357, 1413-1420 (1984).

the purpose in making the payment. *Knuckles v. Commissioner*, 349 F.2d 610 (10th Cir. 1965), affg. a Memorandum Opinion of this Court;[12] *Fono v. Commissioner*, 79 T.C. 680, 694 (1982), affd. without published opinion 749 F.2d 37 (9th Cir. 1984); *Glynn v. Commissioner*, 76 T.C. at 120.

In the context of a suit, if the trier of fact (jury or judge) does not indicate the basis on which the award was arrived at, then to ascertain the nature of the damages, it is necessary to examine the allegations contained in the taxpayer's complaints, the evidence presented, and the arguments made in the State court proceeding. *Threlkeld v. Commissioner*, 87 T.C. 1294 (1986); *Church v. Commissioner*, 80 T.C. at 1107.

The first matter that we must determine is what the settlement settled. In the various actions brought by her, petitioner alleged that the college, in failing to grant her tenure, or at the very least, a "terminal year of teaching", discriminated against her on the basis of sex and national origin, and, thus, violated her constitutional rights and her rights under several Federal and State statutes and, in addition, breached her contract with the college. Although petitioner had voluntarily discontinued the litigation in the State court on February 11, 1975, the breach of contract claim that petitioner had asserted therein was incorporated, as a pendent State claim, in the civil action she brought, on November 25, 1974, in the Federal court. This latter suit and the action brought before the State commission were still pending at the time petitioner and the college agreed upon the settlement figure of $75,000 in March 1975. The Federal commission, on August 27, 1974, had previously rendered its decision that there was reasonable cause to believe that the college had engaged in an unlawful employment practice, and thus violated title VII of the Civil Rights Act of 1964, by discriminating against petitioner on the basis of sex.

It was in this setting that petitioner and the college settled the litigation. Although the general release that petitioner signed did not allocate any part of the settlement payment, it did recite that petitioner was releasing the college, et al., generally from all claims relating to petition-

---

[12]T.C. Memo. 1964-33.

er's employment relationship with the college, including those specific claims pending before the State court, the Federal court, the State commission, and the Federal commission. The indemnification agreement recited that petitioner and the college agreed to settle all claims and actions between the parties and specifically stated that those claims included "claims for reemployment, wages, *compensatory damages for personal injuries,* punitive damages, and reasonable attorneys' fees." (Emphasis supplied.) Moreover, the parties to the indemnification agreement specifically allocated one-half of the $75,000 settlement payment to "all wage claims of [petitioner]"; the remaining $37,500 was allocated "in settlement of all claims other than those claims for wages." We conclude, and we have found, that the settlement payment was made on condition that petitioner release her claims against the college based on breach of contract, and on discrimination on the basis of sex and national origin in violation of petitioner's rights under the 13th and 14th Amendments to the United States Constitution, in violation of several Federal statutes and Executive Orders, and in violation of a State statute.

Although the indemnification agreement purports to make an allocation of the payment, this allocation does not direct us to any specific answer to the question we face. This is so because (1) the parties' settlement agreement denies the reality of the allocation and (2) the allocation categories in the settlement agreement ("wage claims" and "all claims other than those claims for wages") cut across the statutory categories ("damages received * * * on account of personal injuries" and damages received on account of other matters).

Firstly, the indemnification agreement sets forth the allocation, but then states as follows:

however, this division of payment is made for tax purposes only, in order to satisfy Internal Revenue Service Rulings dealing with discrimination claim settlement, and in no way does Muhlenberg College admit, by this division, liability for wage claims, nor shall it be construed that the proportion of payment designated as settlement of all wage claims constitutes reemployment of Ms. Metzger for any period after August 31, 1972; settlement has been agreed upon by Muhlenberg College, as stated in the General Release, to avoid the cost of litigation, and Muhlenberg College admits no liability.

Thus, the payor has specifically disavowed the substance of any allocation to wage claims; this disavowal, in the same sentence in which the allocation is set forth, effectively vitiates the allocation. In this regard, the instant case is distinguishable from *Fono v. Commissioner, supra,* where the allocation did not include any internal disavowal and where we held that the allocation did reflect the intent of the payor. 79 T.C. at 693-694.[13]

Secondly, even if we were to give weight to the allocation in the indemnification agreement, that would not advance the analysis; we still would have to examine the nature of the claims petitioner asserted and which petitioner and the college settled. In particular, we would have to determine whether the "wage claims" were an independent basis for recovery or were an evidentiary factor in determining the amount by which petitioner was damaged as a result of personal injuries which the college assertedly caused. *Bent v. Commissioner,* 87 T.C. 236, 250-251 (1986), on appeal (3d Cir., Feb. 17, 1987).

We proceed to examine the "intent of the payor"—the college—as best we can glean it from the record in the instant case. The various settlement documents, consistent with the testimony of Reagan and Levine, make it clear that the parties intended the settlement to deal with all the issues raised by petitioner in the four proceedings.

In the suit brought in the State court, petitioner asserted a breach of contract claim; no claim was asserted for personal injuries and no damages were sought in this regard.

In the suit brought in the Federal court, petitioner complained that her rights had been violated under the 13th and 14th Amendments to the United States Constitution, and that she was suing for redress under 42 U.S.C. sec. 1983,[14] among other Federal provisions. In *Bent v. Commis-*

---

[13]Also, because of this internal disavowal, we conclude that there is no need to consider the application of the "Danielson rule" or the "strong proof rule". See *Fono v. Commissioner,* 79 T.C. 680, 699 n. 13 (1982), affd. without published opinion 749 F.2d 37 (9th Cir. 1984).

[14]§ 1983. Civil action for deprivation of rights.

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. * * *

[The subsequent amendments of this section by Pub. L. 96-107, 93 Stat. 1284, do not affect the instant case.]

*sioner, supra*, we held that a suit under 42 U.S.C. sec. 1983 is a suit for redress "on account of personal injuries" under section 104(a)(2). We concluded that this result was required by the analysis and language of the Supreme Court in a number of cases, chiefly *Wilson v. Garcia*, 471 U.S. 261 (1985), and *Carey v. Piphus*, 435 U.S. 247 (1978). We stated as follows *(Bent v. Commissioner*, 87 T.C. at 248-249):

> Section 104(a)(2) excludes from gross income "any damages received * * * on account of personal injuries". Section 1.104-1(c), Income Tax Regs., states that damages are excludable if received on account of a legal suit or action involving tort or tort-type rights. From this Treasury Regulation, the validity of which is not in question, it is apparent that excludable damages need not be restricted to those suits or actions involving a tort right—recognized either at common law or under State law. Instead, section 104(a)(2) extends also to those suits or actions which involve a legal right that is more analogous to a tort-type right than to any other legal category of rights. The Supreme Court has declared that sec. 1983 "was intended to '[create] a species of tort liability' " (*Carey v. Piphus*, 435 U.S. at 253), and has held "that §1983 claims are best characterized as personal injury actions" (*Wilson v. Garcia*, 471 U.S. at 280). We conclude that, under both the language of the statute and the interpretation of it that is provided by the regulation, gross income does not include damages received under a sec. 1983 claim based on violation of petitioner's First Amendment right to free speech.

The situation in the instant case is analogous to *Bent* because in both cases the determinative inquiry involves the characterization of the nature of a 42 U.S.C. sec. 1983 claim. The fact that *Bent* involved a 42 U.S.C. sec. 1983 claim based on violation of the taxpayer's First Amendment right to free speech and that the instant case involves a 42 U.S.C. sec. 1983 claim based on violation of petitioner's 13th Amendment and 14th Amendment rights and on Federal statutory rights to be free from discrimination on the basis of sex and national origin does not alter the bottom-line conclusion. Thus, we conclude here, as in *Bent*, that gross income does not include damages received under a 42 U.S.C. sec. 1983 claim based on a violation of petitioner's constitutional rights, or statutory rights, to be free from discrimination on the basis of sex and national origin.

In the Federal court complaint, petitioner also claimed that the college denied her tenure and terminated her employment on the basis of her sex and national origin,

which were actionable under 42 U.S.C. secs. 1981, 1982, 1985(3), and 1986. We believe that these claims also are in the nature of personal injury claims to which section 104(a)(2) applies.

As to 42 U.S.C. sec. 1981,[15] the Supreme Court, in *Runyon v. McCrary*, 427 U.S. 160, 179-182 (1976), held that where no statute of limitations had been prescribed with respect to Federal civil rights litigation under sec. 1981, it was appropriate to apply the State limitations period. The suit was for damages on account of racial discrimination in admission to a private school. The suit was brought 3½ years after the cause of action accrued. State law provided a 2-year statute of limitations for "Every action for personal injuries" and a 5-year statute of limitations for "Every personal action, for which no limitation is otherwise prescribed". The Court held that the 2-year period applied. In so holding, the Court noted as follows (427 U.S. at 182):

And whether the damages claim of the Gonzaleses be properly characterized as involving "injured feelings and humiliation" * * * or the vindication of constitutional rights * * * , there is no dispute that the damage was to their persons, not to their realty or personalty.

See also *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460 (1975) ("An individual who establishes a cause of action under § 1981 is entitled to both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages.") More recently, the Court of Appeals for the Third Circuit, in *Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985), relied on the Supreme Court's analysis in *Wilson v. Garcia*, *supra*, and held that the same personal injury statute of limitations used under 42 U.S.C. sec. 1983 claims should also apply to 42 U.S.C. sec. 1981 claims. The *Goodman* court reasoned as follows (777 F.2d at 119):

In concluding [in *Wilson v. Garcia*] that state statutes for personal injury were the most appropriate for use in § 1983 cases, the Supreme Court believed that the enacting Congress viewed civil rights actions as

---

[15]§ 1981. Equal rights under the law.

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

analogous to state tort claims. In this connection, one might argue, as does the dissent, that since § 1981 on "its face relates primarily to racial discrimination in the making and enforcement of contracts," *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459 * * * (1975), the state statute of limitations applying to suits for breach of contract is the most appropriate one. *See Wilson v. Sharon Steel Corp.*, 549 F.2d 276, 280 (3d Cir. 1977).

We are not persuaded by that argument because it does not recognize the broad sweep of § 1981, *see Mahone v. Waddle*, [564 F.2d 1018, 1030-1031 (3d Cir. 1977)] nor is it consistent with the fundamental reasons underlying *Wilson v. Garcia*. There, the Court emphasized § 1983's derivation from the Fourteenth Amendment, which recognizes the "equal status of every person;" that all persons shall be accorded the full privileges of citizenship; and that no person should be deprived of life, liberty or property "without due process." *Wilson*, [471 U.S. at 277]. As the Court said, "A violation of that command is an injury to the individual rights of the person." *Id.*

Those concepts apply equally to actions under § 1981. Present day § 1981's predecessor was founded on the Thirteenth Amendment that allows "neither slavery nor involuntary servitude" to exist any longer. It is difficult to imagine a more fundamental injury to the individual rights of the person than the evil that comes within the scope of that amendment. Also of significance is that in *Runyon v. McCrary*, the Supreme Court accepted the use of a state's personal injury statute of limitations in a § 1981 case. 427 U.S. at 180-182 * * *

See also *Banks v. Chesapeake & Potomac Telephone Co.*, 802 F.2d 1416, 1421-1423 (D.C. Cir. 1986) (dissent maintains that the relevant period is that for intentional personal injuries, rather than that for negligent personal injuries).

Similarly, many courts have held that claims brought under 42 U.S.C. sec. 1982[16] alleging violations of a person's Federal civil rights may properly be viewed as tort claims brought to redress personal injuries.

*McCausland v. Mason County Bd. of Ed.*, 649 F.2d 278 (4th Cir. 1981), was a suit under 42 U.S.C. secs. 1981, 1982, 1983, 1985, and 1986. McCausland claimed that the school board deprived him of liberty and property without due process of law by discharging him from his post as a high school principal. McCausland contended that the contract statute of limitations (5 years or 10 years) applied. The

---

[16]§ 1982. Property rights of citizens.

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

court held that the personal injury statute of limitations (2 years) applied, as follows (649 F.2d at 279):

We have consistently held, however, that the Reconstruction Civil Rights Acts create causes of action "where there has been injury, under color of state law, to the person or to the constitutional or federal statutory rights which emanate from or are guaranteed to the person." *Almond v. Kent*, 459 F.2d 200, 204 (4 Cir. 1972); *accord, Allen v. Gifford*, 462 F.2d 615 (4 Cir.) * * * (1972); *McCrary v. Runyon*, 515 F.2d 1082, 1097 (4 Cir. 1975), *aff'd.*, 427 U.S. 160, 180-82 * * * (1976). As a consequence it is to the state statute of limitations for personal injuries to which we usually look in determining when claims are time-barred. Although McCausland had and may still have a cause of action on his contract in the state courts, to demonstrate the required constitutional basis for his federal complaint he must allege personal injury transcending contract rights. It follows that, in the absence of any state statute of limitations specifically applicable to suits to redress a violation of civil rights, the West Virginia limitation on personal injury actions applies in this case.

In Allen v. Gifford, 462 F.2d 615 (4th Cir. 1972), the court stated as follows:

Both § 1982 and § 1983 were enacted to redress the infringement of civil rights. Both allow the recovery of damages for personal wrongs. We conclude, therefore, that the reasons stated in *Almond* [*v. Kent*, 459 F.2d 200 (4th Cir., 1972),] for applying Virginia's two-year statute of limitations to actions under § 1983 make the same limitation period appropriate for personal injury suits based on § 1982.

In *Dillon v. Afbic Development Corp.*, 597 F.2d 556, 562 (5th Cir. 1979), the court stated as follows:

An action based upon the federal antidiscrimination statutes [specifically, the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1982] is essentially an action in tort. As the Supreme Court has written in regard to the Fair Housing Act, "A damage action under the statute sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach". *Curtis v. Loether*, 1974, 415 U.S. 189, 195 * * * . The Court noted that an action to redress racial discrimination is analogous to an action for defamation or for intentional infliction of mental distress. 415 U.S. at 195, n. 10 * * * . It further noted that the statutory ban on racial discrimination in housing "could be viewed as an extension of the common-law duty of innkeepers not to refuse temporary lodging to a traveler without justification". *Id.* Civil actions involving private racial discrimination in violation of statute, then, should be treated as tort

actions. *See Patterson v. American Tobacco Co.*, 4 Cir. 1976, 535 F.2d 257, 269 n. 10 * * *

The *Dillon* court then proceeded to treat the defendants under those rules of law that deal with tort liabilities of agents and principals.

In *Meyers v. Pennypack Woods Home Ownership Association*, 559 F.2d 894 (3d Cir. 1977), the plaintiff sued for equitable relief, compensatory and punitive damages and attorney's fees under 42 U.S.C. sec. 1982 and 42 U.S.C. sec. 3601 et seq. The court held that the appropriate statute of limitations as to Meyers' 42 U.S.C. sec. 1982 claim was the Pennsylvania statute applicable to tort claims. 559 F.2d at 901.[17]

Suits under 42 U.S.C. secs. 1985(3)[18] and 1986[19] also have been held to be properly characterized as personal injury suits. *McCausland v. Mason County Bd. of Ed.*, *supra.*

Petitioner also filed a charge of discrimination with the Federal Commission under title VII of the Civil Rights Act of 1964, alleging that the college denied her tenure and terminated her employment contract on the basis of her sex and national origin. Pursuant to this claim, petitioner sought an award of tenure, back pay, and a restoration of all fringe benefits.

---

[17]In *Meyers*, the court held that the appropriate rule was not the 2-year statute applicable to personal injury claims; rather, the appropriate statute was the general 6-year statute, which applied to torts other than personal injuries. However, *Meyers* was implicitly overruled on this point in *Goodman v. Lukens Steel Co.*, 777 F.2d 113, 120 (3d Cir. 1985).

[18]§ 1985. Conspiracy to interfere with civil rights.

(3) If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; * * * in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

[19]§ 1986. Action for neglect to prevent.

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented * * *. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.

Subsection (a) of 42 U.S.C. sec. 2000e-2 provides that it shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin * * *

If, pursuant to 42 U.S.C. sec. 2000e-5(b), the Federal Commission determines that there is reasonable cause to believe that an unlawful employment practice has occurred, then the Federal Commission or the complainant may bring a civil action in the appropriate United States District Court against the respondent employer if the matter is not first resolved by way of a conciliation agreement. 42 U.S.C. sec. 2000e-5(f)(1). 42 U.S.C. sec. 2000e-5(g), authorizes the District Court to provide the following remedies where an unlawful employment practice has occurred:

If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay * * * or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. * * *

Our comparison of title VII and 42 U.S.C. sec. 1981, and the extensive comparison of these statutes by the Supreme Court in *Johnson v. Railway Express Agency, Inc.*, 421 U.S. at 457-461, convinces us that much of what is prohibited under the one statute is prohibited under the other. Accordingly, although the relief sought under one statute may in some cases be different from the relief sought under the other statute, the injuries complained of are often essentially the same. As applied to the instant case, we conclude that the injuries for which petitioner sought relief under 42 U.S.C. sec. 2000e-5 in the Federal Commission proceeding, are as much personal injuries as those for which petitioner sought relief in the Federal Court proceeding.

*Hodge v. Commissioner*, 64 T.C. 616 (1975), involved a settlement of a job discrimination suit under title VII of the Civil Rights Act of 1964. In that job discrimination suit, "plaintiff's only claim for a monetary award was based on the difference between the salary for a line driver and the salary for a city driver from the time of discrimination to the date of judgment." 64 T.C. at 617. We found that, in settling that title VII suit, "The parties used a formula to arrive at a settlement based strictly upon the difference between what a line driver would make and what the plaintiffs had actually made in the years in question." 64 T.C. at 618. We held that back pay is, by its nature, compensation, includable in income (64 T.C. at 619); that the entire amount of the award in the discrimination case was calculated on a back pay basis (i.e., the difference between the plaintiffs' actual pay and the pay they would have received if they had been promoted) (64 T.C. at 620); and that the taxpayer had failed to show that any portion of the award was not for back pay (64 T.C. at 621).

In *Bent v. Commissioner*, 87 T.C. at 250-251, we stated as follows:

It is abundantly clear that "lost earnings" is a proper element of compensatory damages that may be awarded under sec. 1983 in order to redress the party who has been injured by a deprivation of First Amendment rights under color of State law. See *Memphis Community School Dist. v. Stachura*, 477 U.S. ___ (1986) * * *

       *     *     *     *     *     *     *

* * * we conclude that the element of lost wages was not an independent basis for recovery but only an evidentiary factor in determining the amount by which petitioner was damaged. [Citations omitted.]

More recently, in *Threlkeld v. Commissioner*, 87 T.C. at 1299, we stated as follows:

To determine whether the injury complained of is personal, we must look to the origin and character of the claim, *Glynn v. Commissioner, supra, Seay v. Commissioner*, 58 T.C. at 38, and not to the consequences that result from the injury. No doubt a defamatory statement that injures a person's professional reputation will result in lost income. In such cases, the amount of income lost is an accurate measure of the damages sustained because of the injury to reputation. However, the extent to which income is decreased, even though this may be the best measure of loss, in no way changes the nature of the claim. "It is simply not enough that the injury arose in connection with the taxpayer's business or his

professional endeavor, or that the injury is somehow remotely capable of affecting his income." *Church v. Commissioner*, 80 T.C. 1104, 1109 (1983) (distinguishing *Roemer v. Commissioner*, 79 T.C. 398 (1982)).

We conclude that *Hodge* does not stand for the proposition that no damages received as a result of a proceeding under title VII are excludable under section 104(a)(2). Rather, excludability depends on what was the injury complained of, and the loss of income may merely be "an evidentiary factor" (*Bent*) or "the best measure of loss" (*Threlkeld*). In any event, *Hodge* is distinguishable from the instant case, in that, in the instant case (1) the evidence is clear that no effort was made to calculate an amount of back pay, (2) the evidence is clear that the college and petitioner sought to settle all the claims for a single lump sum, (3) the college believed that petitioner's contract claim might result in a liability of $15-20,000, and (4) most of petitioners' claims were tort or tort-type claims on account of personal injuries and were not for back pay, while Hodge's claim, as we have noted, was only for a back pay differential.

Petitioner also complained to the State Commission that the college engaged in an unlawful discriminatory practice and violated the act when it denied her tenure and terminated her employment. Because we believe that the act essentially constitutes a codification of 42 U.S.C. sec. 2000e et seq., under State law, we are of the opinion, for the reasons provided in the foregoing portion of this opinion, that the claim asserted by petitioner before the Commission also is in the nature of a personal injury claim.

From the foregoing, we conclude (and we have found) that not less than $37,500 of the payment petitioner received from the college constitutes damages received on account of personal injuries and so at least that amount is excludable from petitioner's income under section 104(a)(2). Since petitioner has not sought to exclude any greater amount, we need not determine whether any greater amount is excludable.

On brief, respondent contends that:

In this case, no claim for personal injury was ever made. * * * Nor could one be successfully asserted at the time the settlement was

negotiated since the statute of limitations for recovering damages for personal injury had expired at the latest on August 31, 1974.

It may be that this is a correct interpretation of the statute of limitations. See *Smith v. City of Pittsburgh*, 764 F.2d 188, 192-194 (3d Cir. 1985). However, respondent's argument relates to the validity of petitioner's claim. As respondent acknowledged on brief (one page before the above-quoted contention), whether any part of the amount paid pursuant to the settlement agreement is to be excluded from gross income under section 104(a)(2) depends on the *nature* of the claim which was settled, not on the *validity* of the claim. *Seay v. Commissioner*, 58 T.C. at 37. Thus, the fact that the statute of limitations may have expired with respect to any of petitioner's personal injury claims does not prevent us from concluding that a portion of the settlement payment was made to satisfy any such personal injury claim. Rather, as respondent admits on brief, "the payment of $75,000 was being made solely to avoid the cost of litigation." We construe this statement as meaning that the college wanted to avoid expending substantial sums in litigating, among other matters, whether the statute of limitations had expired with respect to any personal injury claim asserted by petitioner. Thus, although the college did not admit any liability to petitioner in making the settlement payment, the college also avoided having to show that it had a valid defense to petitioner's claims, including those asserting personal injury.

We hold for petitioner on this issue.

## II. *Deduction of Legal Fee*

Section 265[20] precludes a deduction for the amount paid for legal fees which are allocable to a class of income

[20]Sec. 265 provides, in relevant part, as follows:

SEC. 265. EXPENSES AND INTEREST RELATING TO TAX-EXEMPT INCOME.

No deduction shall be allowed for—

(1) EXPENSES.—Any amount otherwise allowable as a deduction which is allocable to one or more classes of income other than interest (whether or not any amount of income of that class or classes is received or accrued) wholly exempt from the taxes imposed by this subtitle, or any amount otherwise allowable under sec. 212 (relating to expenses for production of income) which is allocable to interest (whether or not any amount of such interest is received or accrued) wholly exempt from the taxes imposed by this subtitle.

[The subsequent amendment of this provision by sec. 902(d) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2382, does not apply to the instant case.]

exempt from taxation. Sec. 1.265-1(c), Income Tax Regs., provides as follows:

Expenses and amounts otherwise allowable which are directly allocable to any class or classes of exempt income shall be allocated thereto; and expenses and amounts directly allocable to any class or classes of nonexempt income shall be allocated thereto. If an expense or amount otherwise allowable is indirectly allocable to both a class of nonexempt income and a class of exempt income, a reasonable proportion thereof determined in the light of all the facts and circumstances in each case shall be allocated to each.

We have held that $37,500 of the $75,000 settlement payment is excludable from petitioner's income.

Ordinarily, we would allocate the legal fee in the same proportion as the excludable and includable portions of the settlement amount. *Church v. Commissioner*, 80 T.C. at 1110-1111. This is what respondent determined in the notice of deficiency. Petitioner has the burden of proving that respondent's allocation is in error. *Welch v. Helvering*, 290 U.S. 111 (1933). Petitioner has failed to carry this burden. Thus, with respect to the $37,500 settlement payment excludable from gross income, $3,875 of the amount paid as a legal fee is not deductible.[21] *Church v. Commissioner, supra*; see also *Bent v. Commissioner*, 87 T.C. at 251; *Deason v. Commissioner*, 41 T.C. 465, 467-468 (1964).

We hold for respondent on this issue.

> *Decision will be entered for a deficiency in the amount of $1,745.*

[21] $7,750 \times \dfrac{\$37,500 \text{ (excludable from income)}}{\$75,000 \text{ (total settlement payment)}} = \$3,875$.

