ELEANOR L. AND JAMES A. STOCKS, PETITIONERS
*v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 9303-88.          Filed January 2, 1992.

*W. Michael Conway,* for petitioners.
*Roderick H. Fillinger,* for respondent.

CHABOT, *Judge:* Respondent determined a deficiency in
Federal individual income taxes against petitioners for 1984 in

1

the amount of $9,518,[1] and additions to tax under section 6653(a)(1) (negligence, etc.) in the amount of $475.90, under section 6653(a)(2) in the amount of 50 percent of the interest on $9,518, and under section 6661(a) (substantial understatement of income tax) in the amount of $2,379.50.

After concessions,[2] the issues for decision are as follows:

(1) Whether petitioners may exclude from gross income under section 104(a)(2) any part of the $24,000 received pursuant to a settlement agreement and, if so, then how much;

(2) whether petitioners are entitled to deduct any part of the legal expenses paid in connection with the settlement agreement and, if so, then how much.

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioners Eleanor L. Stocks (hereinafter sometimes referred to as Stocks) and James A. Stocks, wife and husband, resided in Dayton, Ohio.

### Stocks' Employment Background

Stocks, a black woman, began working for Sinclair Community College (hereinafter sometimes referred to as Sinclair) in 1972 as a part-time instructor. In September 1973 she began working full time for Sinclair as an instructor in the early childhood education department (hereinafter sometimes referred to as the department). About 1976 Stocks was promoted to assistant professor, and about 1978 she was promoted to associate professor. Stocks was a tenured associate professor at all times relevant to the instant dispute.

---

[1] Of this amount, $6,806 is chapter 1 income tax; the remaining $2,712 is self-employment taxes under chapter 2.

Unless indicated otherwise, all subtitle, chapter, and section references are to subtitles, chapters, and sections of the Internal Revenue Code of 1954 in effect for the year in issue.

[2] Each side conceded an income item. Also, respondent conceded the self-employment taxes and the additions to tax.

The chairperson of each department at Sinclair made an annual performance review of each professor. About 1980 Bonnie Johnson (hereinafter sometimes referred to as Johnson) became chairwoman of the department. Johnson gave a performance rating to Stocks that was lower than Stocks' past ratings. Stocks wrote a letter to the dean, which letter was later presented to the president of Sinclair, and the low rating was changed to a higher rating. Johnson became dean of the division (extended learning and human services) that included the department. The next chairwoman of the department, Donna Murphy, gave high ratings to Stocks. In 1983 Karen Winston (hereinafter sometimes referred to as Winston) became chairwoman of the department. Winston began documenting concerns regarding Stocks' performance as a professor, including Stocks' allegedly not keeping certain required office hours, "splitting" her office hours, shortening class periods, and not making required visits to observe Stocks' student teachers.

*Stocks' Discrimination Charges*

On July 13, 1983, Stocks filed a charge of discrimination (hereinafter sometimes referred to as the first charge) with the Ohio Civil Rights Commission (hereinafter sometimes referred to as the OCRC), with instructions that the first charge was also to be filed with the U.S. Equal Employment Opportunity Commission (hereinafter sometimes referred to as the EEOC). In the first charge, Stocks alleged that she had been discriminated against on the basis of race when Sinclair selected a white person to teach a certain course even though Stocks had asked to teach that course and had taught that course before. Before filing the first charge, Stocks had contacted an attorney, Richard Austin (hereinafter sometimes referred to as Austin), who was at that time the president of the Dayton chapter of the National Association for the Advancement of Colored People (hereinafter sometimes referred to as the NAACP). Stocks filed the first charge without Austin's help. In relation to the first charge, the OCRC issued a letter of no probable cause, and a 90-day right-to-sue letter. Stocks did not file a lawsuit against Sinclair with respect to the first charge.

In September 1983, Stocks filed a second charge of discrimination (hereinafter sometimes referred to as the second charge) with the OCRC and the EEOC. In the second charge, Stocks alleged that she had been discriminated against on the basis of race, and also alleged "retaliation". Stocks alleged that she was discriminated against when her August 1983 pay was docked because she took 6 days of personal (nonmedical) leave in May. In the second charge, Stocks stated that she was told that unless she had a statement from a physician, her pay would be docked. She alleged that, in contrast, white faculty members had taken personal leave without being required to present medical statements. The OCRC issued a letter of no probable cause with respect to the second charge. Stocks and Austin wrote a letter to the OCRC appealing the no-probable-cause letter. It is unclear whether a 90-day right-to-sue letter was issued. Stocks did not file a lawsuit against Sinclair with respect to the second charge.

Sinclair was aware that these charges had been filed. Ned Sifferlen (hereinafter sometimes referred to as Sifferlen), Sinclair's vice president for instruction, met with representatives from the OCRC in 1983 to discuss the charges made by Stocks. After this meeting an investigator with the OCRC told Sifferlen not to worry about the charges.

*Stocks' Contract Not Renewed*

In November 1983 Winston gave to Stocks an overall rating of unsatisfactory on Sinclair's annual faculty performance review for the period January-September 1983. Johnson recommended to Sifferlen that Stocks' employment at Sinclair be terminated. Under normal procedures, in such a situation the tenured faculty member, the department chairperson, and the division dean were to meet to produce a "professional growth plan" which, if adhered to, would result in the faculty member's not receiving an unsatisfactory rating the next year. According to Sinclair's handbook, a professor's employment is not terminated unless the professor receives an overall rating of unsatisfactory 2 years in a row. Stocks continued to teach at Sinclair during the 1983-84 school year. Stocks, Winston, and Johnson were not able to produce a professional growth plan. Stocks did not use Sinclair's administrative grievance process.

In June 1984 when Sinclair sent out teaching contracts for the 1984-85 school year, Sifferlen decided not to send a contract to Stocks.

Stocks received a letter from Sifferlen asking her to meet with him about her employment status. As a result, Stocks and Sifferlen met in June 1984 to discuss Stocks' employment during the following school year.

Sinclair's faculty handbook provided that if a faculty member was not going to be rehired for a school year, notice must be given to the faculty member before February 1 of the year in which the contract expired. No notice was given to Stocks before February 1, 1984, that she would not be rehired for the 1984-85 school year.

*Stocks' Deposition*

Sinclair took Stocks' deposition on August 21, 1984. The questioning was entirely by Sinclair's lawyer, and centered on Stocks' unsatisfactory rating on Sinclair's annual faculty performance review and Sinclair's concerns in regard to Stocks' performance during the winter and spring quarters. At the end of the deposition, Sinclair's lawyer asked if Stocks had anything further that she wanted to say. Stocks responded by first reminding Sinclair's lawyer that she had filed two civil rights claims and then stated that the underlying cause of the contentions about Stocks' performance was racial discrimination. The questioning concluded with the following colloquy:

Q. [Sinclair's lawyer] I would like to say one more thing for the record.
With respect to the items that you just listed for us that amount to allegations of race discrimination, am I to understand that you do have the factual support for those allegations?
A. [Stocks] The ones I read to you, I think so. I think that I could—In fact, the Civil Rights Commission has the proposal in terms of—Yes, we can deal with those.

During the deposition, Stocks did not make references to Sinclair's lack of timely notice of termination. Stocks viewed the deposition as an opportunity to clear up past problems and to possibly continue her employment with Sinclair.

Sifferlen had not read the deposition transcript as of the time of his testimony at the trial in the instant case. However,

Sinclair's lawyer had given to Sifferlen a general description of the deposition.

As of August 31, 1984, Sinclair had not yet decided to terminate Stocks' employment.

At the time of the deposition, no contract claims or discrimination claims had been filed in any court. However, Sinclair's decision to take a deposition was precipitated by indications that Stocks was going to bring suit against Sinclair.

*Settlement*

After Stocks was deposed, Sinclair sent a letter of suspension to Stocks, and settlement negotiations began between Austin and Sinclair's lawyer. Stocks was represented by Austin from the filing of the second charge in the summer of 1983, through the execution of the settlement agreement in November 1984. Austin sent to Sinclair's lawyer a letter outlining the following items that Stocks expected to receive from Sinclair in settlement:

(1) A lump-sum payment equal to the amount of salary Stocks would have received during the 1984-85 school year as an associate professor;
(2) fringe benefits;
(3) attorney fees of about $2,000;
(4) a neutral reference letter; and
(5) the expungement of any negative information and references from Stocks' personnel file.

Sifferlen recommended to Sinclair's president that Sinclair settle with Stocks on the basis of the proposal in Austin's letter. On November 9, 1984, Sinclair and Stocks executed a document entitled "Settlement Agreement and Full Release of Claims" (hereinafter sometimes referred to as the settlement agreement). The settlement agreement provides in pertinent part, as follows:

This is a Settlement Agreement and Full Release of all claims ("Agreement") between Eleanor Stocks and Sinclair Community College (the "College").

This Agreement is intended to settle all outstanding claims by Eleanor Stocks against Sinclair Community College. Therefore, Eleanor Stocks and the College agree as follows:

1. Eleanor Stocks will submit her resignation, effective on the date of execution of this Agreement.

2. Eleanor Stocks fully gives up, releases, and settles all claims in any way connected with Sinclair Community College, together with all other claims, lawsuits or demands of any kind, including attorney's fees and litigation costs, which she has made or which she could make against the college or its officers, employees or agents, arising out of her employment relationship with the College and accruing before the date of signing this Agreement.

The settlement agreement further provides that Stocks will not seek reemployment with Sinclair, that Sinclair will remove from Stocks' personnel file all adverse and negative references, and that Sinclair will give to any future employers of Stocks a neutral reference letter.

Pursuant to the settlement agreement, Sinclair paid $24,000 to Stocks, and Stocks tendered her resignation to Sinclair. The settlement amount was calculated by Sinclair as the sum of what would have been Stocks' salary for the 1984-85 school year, plus some amount.[3] Sinclair reported this payment to the Internal Revenue Service on Form 1099-MISC as "Nonemployee compensation". The decision to report this payment on a Form 1099-MISC was made by Sinclair's chief fiscal officer after conferring with Sinclair's chief legal counsel. Sinclair did not withhold any taxes from the settlement payment, and did not issue a Form W-2 to Stocks in regard to the settlement payment.

Petitioners reported on their 1984 tax return the $14,711.20 shown on a Form W-2 from Sinclair to Stocks. Petitioners also reported on their 1984 tax return the $7,095.78 shown on a Form 1099-MISC from Raintree Associates, Inc. Realtors to Stocks. This was reported on Schedule C and Stocks' $671 net profit from this activity was reported on Schedule SE and a self-employment tax liability was shown on the tax return.

Petitioners did not report the $24,000 settlement payment on their 1984 Federal tax return.

Petitioners paid $1,750 to Austin as legal fees which were attributable to Stocks' disputes with Sinclair. Austin received the payments as follows: $100 on August 7, 1983, $150 on September 7, 1983, and $1,500 on November 19, 1984.

---

[3]The settlement agreement states that the "lump sum of $24,000 [is] to include all claims, including attorney's fees, against the College." However, Sifferlen testified that the $24,000 comprised Stocks' regular salary ($22,037) and the cost of fringe benefits.

Petitioners did not deduct the legal fees on their 1984 tax return.

Sinclair intended to settle two distinct types of potential claims. The settlement payment was received on condition that Stocks release all claims against Sinclair; this included Stocks' potential breach of contract claim against Sinclair and Stocks' potential racial discrimination claim against Sinclair. Of the $24,000 payment, $20,000 was received on account of Stocks' potential contract claim, and $4,000 was received on account of Stocks' potential racial discrimination claim. The money which petitioners paid in legal fees is allocable in the same proportion; i.e., five-sixths is attributable to the potential contract claim and one-sixth is attributable to the potential racial discrimination claim.

OPINION

I. *Excludability of the Settlement Payment (Sec. 104(a)(2))*

Respondent contends that the $24,000 settlement received by petitioners from Sinclair was in settlement of contractual claims and therefore no part of it is excludable from gross income under section 104(a)(2).

Petitioners contend that the entire settlement was received on account of discrimination charges which are personal in nature and therefore all of it is excludable from income under section 104(a)(2).

We agree with respondent in part and with petitioners in part.

A. *Nature of the Settlement Payment*

Section 61(a)[4] states that, except as otherwise provided, gross income means "all income from whatever source derived".

---

[4]Sec. 61(a) provides, in pertinent part, as follows:

SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle [i.e., subtitle A, relating to income taxes], gross income means all income from whatever source derived * * *

Section 104(a)(2)[5] provides otherwise, in that it excludes from gross income damages received on account of personal injuries or sickness. However, the Internal Revenue Code of 1954 does not explain what a taxpayer must show in order to prove that the damages were received "on account of personal injuries". *Seay v. Commissioner,* 58 T.C. 32, 36 (1972).

This Court recently explored in detail the history and prior interpretations of section 104(a)(2) in *Downey v. Commissioner,* 97 T.C. 150 (1991). The issue in *Downey* involved the scope of the section 104(a)(2) exclusion. Section 104(a)(2) excludes only damages received on account of the prosecution or settlement of tort or tort-type claims, not damages received on account of the prosecution or settlement of economic rights arising out of a contract. *Downey v. Commissioner,* 97 T.C. at 160. See also *Metzger v. Commissioner,* 88 T.C. 834, 848-850 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988).

It is well established that the term "personal injuries" in section 104(a)(2) includes nonphysical injuries as well as physical injuries. *Threlkeld v. Commissioner,* 848 F.2d 81, 84 (6th Cir. 1988), affg. 87 T.C. 1294, 1308 (1986); *Downey v. Commissioner,* 97 T.C. at 159; *Bent v. Commissioner,* 87 T.C. 236, 244 (1986), affd. 835 F.2d 67, 69-71 (3d Cir. 1987). Injuries resulting from invidious racial discrimination are personal injuries for purposes of section 104(a)(2). See *Burke v. United States,* 929 F.2d 1119, 1121-1122 (6th Cir. 1991), cert. granted 502 U.S. ___, 60 U.S.L.W. 3257 (Oct. 7, 1991); *Downey v. Commissioner,* 97 T.C. at 159. See also *Metzger v. Commissioner,* 88 T.C. at 850-851. Respondent does not dispute this proposition.

---

[5]Sec. 104(a) provides, in pertinent part, as follows:

SEC. 104. COMPENSATION FOR INJURIES OR SICKNESS.

(a) IN GENERAL.—Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(2) the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness;

[The subsequent amendment of this provision by sec. 7641(a) of the Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, 103 Stat. 2106, 2379, does not apply to the instant case.]

Section 104(a)(2) provides for exclusion of damages[6] received through a settlement agreement, as well as through a suit. *Metzger v. Commissioner,* 88 T.C. at 847. In the instant case, petitioners received the $24,000 through a settlement agreement. Where a settlement agreement exists, determining the exclusion from gross income depends on the *nature* of the claim that was the actual basis for settlement rather than the *validity* of the claim. *Metzger v. Commissioner,* 88 T.C. at 847; *Threlkeld v. Commissioner,* 87 T.C. at 1297; *Seay v. Commissioner,* 58 T.C. at 37.

*Bent v. Commissioner, supra,* is distinguishable on the latter point. Although *Bent* was a settlement case, the settlement was arrived at after the Delaware Chancery Court had ruled against Bent on his contract and property claims and for Bent on his free-speech claim. *Bent v. Commissioner,* 87 T.C. at 240-241; 835 F.2d at 69. In those circumstances, we held that the school board was paying money to Bent to settle only the claim that the Chancery Court had held to be valid. *Bent v. Commissioner,* 87 T.C. at 245-246; 835 F.2d at 69. In the instant case, in contrast, no court ruled on the validity of any of Stocks' potential claims.

If the settlement agreement lacks express language stating what the settlement amount was paid to settle, then the most important factor in determining any exclusion under section 104(a)(2) is "the intent of the payor" as to the purpose in making the payment. *Knuckles v. Commissioner,* 349 F.2d 610, 612 (10th Cir. 1965), affg. T.C. Memo. 1964-33; *Metzger v. Commissioner,* 88 T.C. at 847-848; *Glynn v. Commissioner,* 76 T.C. 116, 120 (1981), affd. without published opinion 676 F.2d 682 (1st Cir. 1982).

---

[6]We note that the Court of Appeals for the District of Columbia recently held that an award of backpay in a racial discrimination suit filed under Title VII of the Civil Rights Act of 1964 is not "damages" and is, therefore, not excludable from income under sec. 104(a)(2). *Sparrow v. Commissioner,* 994 F.2d 434 (D.C. Cir. 1991), affg. T.C. Memo. 1989-315. In the instant case, Stocks did not file any suit, and respondent does not contend that any part of Stocks' settlement payment is not damages within the meaning of sec. 104(a)(2). Accordingly, we do not have before us the issue which was deemed controlling in *Sparrow.* Moreover, the Court of Appeals for the D.C. Circuit expressly recognizes in *Sparrow,* 994 F.2d at 438, that its view "conflicts with that of the Sixth Circuit." Since the instant case is appealable to the Sixth Circuit, if the definition of damages were to be a consideration in the instant case, then we would be compelled to follow the Court of Appeals for the Sixth Circuit. *Golsen v. Commissioner,* 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Thus, the instant case does not present an appropriate occasion to consider the damages definition analysis presented in *Sparrow v. Commissioner, supra.*

The first matter that we must determine is what the settlement settled. This is a factual inquiry. *Seay v. Commissioner,* 58 T.C. at 37. The setting is relevant in determining the intent of the payor. See *Metzger v. Commissioner,* 88 T.C. at 848; *Bent v. Commissioner,* 87 T.C. at 245. The factual setting in the instant case involves two types of potential claims—breach of contract and racial discrimination.

Firstly, the setting involves a potential breach of contract claim. In 1983 Stocks received an unsatisfactory rating on her faculty performance review. This rating was followed by the inability of Stocks, Winston, and Johnson to produce a professional growth plan. In June 1984 Sifferlen decided not to send to Stocks a contract for the 1984-85 school year. Sinclair did not give notice to Stocks before February 1, 1984, that Stocks would not be rehired for the 1984-85 school year. Sinclair's faculty handbook required such notice to be given before Sinclair failed to rehire a faculty member.

Secondly, the setting includes racial discrimination charges. Stocks had filed two civil rights complaints with the OCRC and the EEOC in 1983. In 1983 Stocks had hired an attorney, Austin, who was affiliated with the NAACP. Austin represented Stocks from the filing of the second charge through the settlement negotiations with Sinclair. The settlement payment in November 1984 was preceded by Stocks' deposition in August 1984. Although the overall focus of the deposition was Sinclair's lawyer's questions as to Stocks' alleged unsatisfactory performance as a professor, at the end of the deposition Stocks made it plain that she would, if necessary, proceed before the OCRC. After this deposition, Sinclair suspended Stocks, Austin negotiated with Sinclair's counsel, and Austin sent a letter to counsel for Sinclair outlining a settlement amount.

In determining the nature of the claim that the payor intended to settle, we also look to Sifferlen's trial testimony, in pertinent part, as follows:

Q. [Respondent's counsel, on direct examination] What are the reasons—okay. We now, know how the $24,000 was calculated. What are the reasons that the $24,000 payment was made to Eleanor Stocks?

A. [Sifferlen] First, we felt that it was an obligation that we had a responsibility for that money in that we did not notify her by February 1st that her contract was not going to be renew [sic].

The second thing is the $24,000 we spent in exchange for her resigning from the college.

Q. Did the school—or was it your understanding on behalf of the school that the school was in any way settling a claim for personal injury to Eleanor Stocks?

A. We did not.

     \*     \*     \*     \*     \*     \*     \*

Q. Would the school have settled in the same manner with Eleanor Stocks even if she hadn't filed the complaints with the Ohio Civil Rights Commission and Equal Opportunity Commission alleging racial discrimination?

A. We would have.

Q. Did the EEOC and OCRC complaints have anything at all to do with Eleanor Stocks' unsatisfactory review or termination of her employment?

A. Absolutely nothing, as far as I'm concerned.

     \*     \*     \*     \*     \*     \*     \*

Q. [Petitioner's counsel, on cross examination] Okay. Now, when you got the release that was signed in this manner from—or the compromise agreement, let's call it—

A. Settlement agreement.

Q. Settlement agreement—that was signed by Mrs. Stocks, that released, basically, all claims she had against the college, including civil rights claims; is that right?

A. That's correct.

Q. And would you have settled this case and paid her $24,000 had she not released any civil rights claims she might have had?

A. I don't remember the civil rights claim as being part of it, but we probably would not have.

After counsel for both sides stated they had no further questions for Sifferlen, the Court inquired and Sifferlen responded, as follows:

THE COURT: Dr. Sifferlen, when Ms. Benson was retained to represent the college at the—in connection with this matter, who was representing the college in terms of decisions to be made, instructions to be given, matters of that sort?

THE WITNESS: I was, Your Honor.

THE COURT: Why was a deposition taken?

THE WITNESS: I can't recall the answer to that. Best I can recollect is that Mrs. Stocks had contacted legal counsel, and legal counsel had contacted the college.

And there was indication that she was to bring suit against the college, and that's what precipitated it.

\*     \*     \*     \*     \*     \*     \*

THE COURT: There was concern that Mrs. Stocks was bringing suit or was going to bring suit against the college?

THE WITNESS: That's correct.

THE COURT: What was it that was understood to be the subject matter of this potential suit?

THE WITNESS: I do not know that. I anticipate that it was because she had not received her contract for the 1984-85 year.

On resumed redirect examination, respondent's counsel elicited the following testimony from Sifferlen:

Q. Okay. In your understanding, when the college entered into the settlement with Eleanor Stocks on November 9th, 1984, what were you settling?

A. As I mentioned, we thought we were settling—I thought we were settling the fact that we did not notify Eleanor by February 1st that she was [not?] to receive a contract for 1984-85, and she had claim to the fact that since we did not notify her by that date listed in the faculty handbook that the college was obligated to pay her salary for the coming year.

It is clear from the transcript testimony that Sinclair felt an obligation to settle with Stocks on a potential contract claim because Sinclair failed to give Stocks timely notice of termination. However, we cannot ignore Sifferlen's statement that Sinclair probably would not have settled as it did unless Stocks agreed to settle the discrimination charges. This statement reflects an intent by Sinclair to settle any dispute in regard to Stocks' allegations of discrimination on account of race. Further, the settlement agreement states three times in its first 14 lines that Stocks was settling all claims against Sinclair. Consequently, we cannot conclude that the settlement included only the potential contract claim.

In the instant case two separate types of potential claims existed, and we conclude and have found that Sinclair intended to settle two distinct types of potential claims. We base this conclusion on two factors: (1) The factual setting which involved both a potential claim of breach of contract and a potential racial discrimination claim, and (2) the testimony by Sifferlen that Sinclair intended to settle a potential contract claim, but that it probably would not have settled as it did had Stocks not released her potential racial discrimination claims against Sinclair.

Our conclusion that the present case involves the settlement of two separate types of potential claims leads us to conclude that we must allocate amounts to each claim. E.g., *Eisler v. Commissioner,* 59 T.C. 634, 640 (1973), and cases cited therein.

Our recent opinion in *Downey v. Commissioner, supra,* is not to the contrary. In *Downey* a settlement agreement allocated the settlement award half to liquidated damages and half to nonliquidated damages. This Court determined that the entire settlement award was excludable as damages on account of personal injury. In *Downey,* this Court specifically found that the taxpayer received the settlement award solely on account of an age discrimination claim under the Age Discrimination in Employment Act. *Downey v. Commissioner,* 97 T.C. at 157. *Downey* did not address a situation where a settlement award was received on account of two different types of claims. In *Bent v. Commissioner, supra,* the taxpayer had initiated several claims. The State trial court had already held that all but one of the taxpayer's claims was invalid and that one claim was valid. We held that the entire award was excludable because it was received on account of the one claim that had been ruled to be valid. Thus there was no need for allocation. *Bent v. Commissioner,* 87 T.C. at 245-256; 835 F.2d at 69. In the instant case, there are two potential claims, with different tax consequences, and so we must allocate. *Metzger v. Commissioner, supra,* is much more like the instant case. In *Metzger,* there were numerous claims, with different tax consequences. We were spared the task of assigning a specific dollar amount to the personal injury claims because (1) we had concluded that at least half of Metzger's award was allocable to those claims and (2) Metzger had sought to exclude only half of her award.

Respondent relies on *Kurowski v. Commissioner,* 917 F.2d 1033 (7th Cir. 1990), affg. T.C. Memo. 1989-149, as presenting a factual setting "quite similar" to the instant case. In *Kurowski,* the taxpayer (a teacher) had suffered recurring psychiatric problems. The taxpayer's employer (a public school district) required the taxpayer to be examined by a psychiatrist. Over the next few years, the taxpayer was on leave of absence, was hospitalized several times, was treated by several psychiatrists, and finally returned to teaching. After a few months, she was suspended because of new

evaluations of the effects of her mental illness. The school district initiated proceedings before a hearing officer to remove the taxpayer from her tenured position. The hearing officer postponed the hearing at the request of both sides because of the taxpayer's apparent inability to participate in the dismissal proceedings. The hearing officer had articulated the pertinent issue as to whether the school district could require treatment by a physician not of the taxpayer's choosing. The teacher and the school district then negotiated a settlement.

In *Kurowski,* the taxpayer's personal injury claim was in violation of her right to select a physician of her choice; in the instant case petitioner's personal injury claim was invidious racial discrimination, clearly a personal injury matter. In *Kurowski,* the dispute had focussed for years on the taxpayer's mental condition as affecting her ability to teach, with the right to her choice of physician being raised only in the last stage of the proceedings; in the instant case, Stocks had twice filed racial discrimination charges and had warned Sinclair's counsel of her racial discrimination contentions at the deposition, shortly before the settlement. In *Kurowski,* the taxpayer gave up only her tenured teaching position; in the instant case, Stocks gave up her tenured teaching position and also "all claims in any way connected with Sinclair Community College, together with all other claims, lawsuits or demands of any kind".

We conclude that the major similarity between *Kurowski* and the instant case is that the taxpayer in each case was a teacher. As far as that goes, the instant case is also similar to *Metzger v. Commissioner, supra,* and *Bent v. Commissioner, supra.* Beyond that element of the taxpayer's profession, the instant case is closer to *Metzger* and *Bent* than it is to *Kurowski.*

Respondent notes that the amount Stocks received was the amount she would have received as compensation under her contract with Sinclair. From this, he concludes that the amount must be taxed as ordinary income. We disagree. As we explained in *Downey v. Commissioner, supra,* the consequences of an injury, such as lost wages, should not be confused with the nature of the injury. Lost wages may be the best measure of the extent of the personal injury. *Downey v. Commissioner,* 97 T.C. at 161-164. To the same effect are

*Threlkeld v. Commissioner,* 848 F.2d at 84 ("We agree with the Ninth and the Third Circuits that the nonpersonal consequences of a personal injury, such as a loss of future income are often the most persuasive means of proving the extent of the injury that was suffered, and that the personal nature of an injury should not be defined by its effect."); *Bent v. Commissioner,* 87 T.C. at 250 ("consideration of a taxpayer's lost wages is appropriate in disposing of a sec. 1983 claim for redress of injuries resulting from violations of the First Amendment, as well as in disposing of an employment contract claim"). Thus, the evidence that the amount Stocks received in settlement was determined by reference to the amount she would have received as compensation is irrelevant in determining the nature of the injury.

Petitioners contend that the only claims that Stocks presented to Sinclair, and thus the only claims Sinclair paid to settle, were Stocks' charges of racial discrimination. Respondent contends that "petitioners cannot meet their burden of proving that the college's intention was to settle a race discrimination claim when they have failed to present any evidence that this claim was actually communicated to the college." Both sides seem to ignore parts of the record. Sifferlen's extensive testimony makes it clear that the February 1 notification rule in Sinclair's faculty handbook was viewed as an absolute impediment to Sifferlen's conclusion that Stocks should not teach at Sinclair for the 1984-85 school year; thus, there was a potential contract claim which, we have concluded, Sinclair paid to dispose of. Stocks' filing of two racial discrimination claims in 1983, combined with her statements at the August 1984 deposition that she had factual support for her contention that the then current proceedings were bottomed on racial discrimination, make it clear that Stocks' potential racial discrimination claim "was actually communicated to the college"; thus there was a potential racial discrimination claim which, we have concluded, Sinclair paid to dispose of.

In the instant case we face the apportionment task that we were able to avoid in *Bent* and *Metzger.* We now proceed to execute that task. *Eisler v. Commissioner,* 59 T.C. at 640.

B. *Allocation of Settlement Payment*

In deciding the allocation issue in the instant case, we begin by reexamining the intent of the payor in making the settlement payment. The most significant fact in the record is the testimony by Sifferlen which focused on Sinclair's intent to settle a contract claim. We conclude that the breach of contract claim was the predominant reason motivating Sinclair's payment to Stocks.

In trying to understand Sifferlen's almost complete refusal to acknowledge the potential racial discrimination claim as having any bearing on the settlement, despite what seems to us to be clear evidence that that claim did play some part, we note that Sinclair's concession of the failure to give timely notice is a concession of a mere procedural fault; the racial discrimination issue, however, accuses Sinclair, and possibly Sifferlen himself, of a more deep-seated and troubling flaw. The thrust of Sifferlen's testimony, given more than 6 years after the settlement was arrived at, may reflect a reluctance to remember the unpleasant charge.

We have concluded that Sinclair intended the settlement to dispose of the potential racial discrimination claim as well as the potential contract claim, and so we must allocate a portion of the settlement to the potential racial discrimination claim. *Helvering v. Taylor,* 293 U.S. 507 (1935); *Durkee v. Commissioner,* 162 F.2d 184, 187 (6th Cir. 1947), remanding 6 T.C. 773 (1946); see *Cohan v. Commissioner,* 39 F.2d 540, 544 (2d Cir. 1930). Since we have concluded that Sinclair's predominant motivation in entering into the settlement agreement with Stocks was to settle a potential contract claim, we conclude that most of the settlement amount should be allocated to the potential contract claim. It is our best judgment, based on the record as a whole, that $20,000 is allocable to the potential contract claim and the remainder, or $4,000, to the potential racial discrimination claim. Therefore, $4,000 is excludable under section 104(a)(2).

We hold in part for respondent and in part for petitioners on this issue.

II. *Deductibility of Legal Expenses (Sec. 265(a))*

Petitioners contend that, if it is determined that they are not entitled to exclude the settlement payment from income, then

they are entitled to deduct the legal fees attributable to the settlement payment. Respondent does not respond on brief to this contention.

We agree with petitioners in part.

Section 265(a)(1) precludes a deduction for an amount paid for legal fees if it is allocable to a class of income exempt from taxation. Section 1.265-1(c),[7] Income Tax Regs., provides as follows:

Expenses and amounts otherwise allowable which are directly allocable to any class or classes of exempt income shall be allocated thereto; and expenses and amounts directly allocable to any class or classes of nonexempt income shall be allocated thereto. If an expense or amount otherwise allowable is indirectly allocable to both a class of nonexempt income and a class of exempt income, a reasonable proportion thereof determined in the light of all the facts and circumstances in each case shall be allocated to each.

We have held that $20,000, or five-sixths, of the settlement payment is includable in income. That portion of the legal fees that is allocable to the includable $20,000 is deductible (sec. 212(1)); that portion that is allocable to the excludable $4,000 is not deductible (sec. 265(a)). Ordinarily, we would allocate the legal fee in the same proportion as the excludable and includable portions of the settlement amount. *Metzger v. Commissioner,* 88 T.C. at 860; *Church v. Commissioner,* 80 T.C. 1104, 1110-1111 (1983). In the instant case, too, a proportionate allocation is appropriate. We conclude that five-sixths of the legal fees is deductible.

We hold in part for petitioners and in part for respondent on this issue.

---

[7]Sec. 265 provides, in pertinent part, as follows:

SEC. 265. EXPENSES AND INTEREST RELATING TO TAX-EXEMPT INCOME.

(a) GENERAL RULE.—No deduction shall be allowed for—

(1) EXPENSES.—Any amount otherwise allowable as a deduction which is allocable to one or more classes of income other than interest (whether or not any amount of income of that class or classes is received or accrued) wholly exempt from the taxes imposed by this subtitle, or any amount otherwise allowable under section 212 (relating to expenses for production of income) which is allocable to interest (whether or not any amount of such interest is received or accrued) wholly exempt from the taxes imposed by this subtitle.

[The subsequent amendment of this provision by sec. 902(d) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2382, does not apply to the instant case.]

To take account of the foregoing, and the parties' concessions (*supra* note 2),

*Decision will be entered under Rule 155.*