T.C. Summary Opinion 2004-28

UNITED STATES TAX COURT

WALLY O. AND KATE A. OYELOLA, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6599-02S.                    Filed March 12, 2004.

Wally O. and Kate A. Oyelola, pro sese.

<u>Frank W. Louis</u>, for respondent.


WHERRY, <u>Judge</u>:  This case was heard pursuant to the
provisions of section 7463 of the Internal Revenue Code in effect
at the time the petition was filed.[1]  The decision to be entered
is not reviewable by any other court, and this opinion should not
be cited as authority.

---

[1] Unless otherwise indicated, section references are to
sections of the Internal Revenue Code in effect for the years in
issue, and Rule references are to the Tax Court Rules of Practice
and Procedure.

Respondent determined Federal income tax deficiencies for petitioners' 1997 and 1998 taxable years in the amounts of $898 and $30,008, respectively. Respondent also determined an accuracy-related penalty in accordance with section 6662(a) of $3,793 for 1998. After concessions by petitioners, the sole issue for decision is whether a $30,000 payment received by petitioner Wally O. Oyelola (also known as Oluwole Oyelola and hereinafter Mr. Oyelola) is excludable from gross income under section 104(a).

## Background

Some of the facts have been stipulated and are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference. At the time the petition was filed in this case, petitioners resided in Tolland, Connecticut.

Mr. Oyelola began working for Connecticut Mutual Life Insurance Company in December of 1989. On May 13, 1996, Mr. Oyelola filed a racial discrimination complaint against Connecticut Mutual Life Insurance Company with the Connecticut Commission on Human Rights and Opportunities. This complaint was amended on August 5, 1996, but was ultimately dismissed because it was not filed within 180 days of the alleged unlawful employment practices.

Thereafter, on February 11, 1998, Mr. Oyelola brought an action against Massachusetts Mutual Life Insurance Company[2] and various individuals in the U.S. District Court for the District of Connecticut. The complaint in this action, brought under Title VII of the Civil Rights Act of 1964, alleged a history of discrimination based on race, color, ancestry, and national origin.

The District Court action was resolved by a General Release, Confidential Separation Agreement, Waiver and Covenant Not To Sue (settlement agreement) executed by Mr. Oyelola and a representative for Massachusetts Mutual Life Insurance Company and the individual defendants on August 20 and 27, 1998, respectively. The stated purpose of the settlement agreement was "to resolve any and all differences that may now exist, or may arise in the future as a result of any act that has heretofore occurred, under state or federal law regarding employment with and separation from the Company". The document then provided in Paragraph 4 for the following settlement terms:

> a. The Company will pay to Mr. Oyelola the amount of Thirty Thousand Dollars ($30,000.00) (Payment 1). Payment 1 is payable to Mr. Oyelola based on his claim that he is entitled to compensation for emotional distress.

---

[2] Massachusetts Mutual Life Insurance Company and Connecticut Mutual Life Insurance Company merged in 1996, and Mr. Oyelola's employment apparently continued with the merged entity under the Massachusetts Mutual Life Insurance Company name.

b.    The Company will pay to Mr. Oyelola the amount of Ninety Thousand Dollars ($90,000.00), minus appropriate withholdings and deductions (Payment 2).  Payment 2 is payable to Mr. Oyelola as compensation for Mr. Oyelola's claims of lost wages.

c.    The Company will pay to Mr. Oyelola the amount of Sixty Thousand Dollars ($60,000.00) for any and all attorney's fees, costs and claims incurred by Mr. Oyelola (Payment 3).  Payment 3 is payable to Mr. Oyelola's counsel of record, Nitor V. Egbarin, Esq.

d.    The Company will pay to Mr. Oyelola the sum of Seven Thousand Eight Hundred Twenty Four Dollars ($7,824.00), which is an amount equivalent to the cost of 12 months of continued COBRA benefits, including both medical and dental coverage (Payment 4).  Payment 4 is payable to Mr. Oyelola.

e.    The Company will provide Mr. Oyelola with three (3) months of outplacement services at Lee Hecht Harrison or an equivalent placement agency of the Company's choice.

f.    Mr. Oyelola agrees that he has not relied on the Defendants for information or advice regarding the taxability of any monies paid to him.  Mr. Oyelola further agrees that the Company will issue the appropriate Internal Revenue Service Forms 1099 with respect to the monies paid to him pursuant to Paragraph 4 above. * * * The Defendants represent no position regarding the question of tax liability in relation to any settlement payment made to Mr. Oyelola or his attorney and encourage Mr. Oyelola to rely on his own Accountant or Tax Attorney for advice.

g.    In the event of a tax assessment against the Company by any federal, state or local taxing authority as a result of not making deductions or withholding from the monies paid to Mr. Oyelola under this Paragraph 4, Mr. Oyelola shall pay the employee's share of that assessment.  Mr. Oyelola agrees that if he declines to pay his portion of any such assessment he will indemnify and hold the Company harmless for the amount equal to the employee's portion of the tax assessment, as well as for any and all interest or penalties the Company may be required to pay to the

Internal Revenue Service or other taxing authority, and reasonable attorney's fees incurred.

Mr. Oyelola further agreed, in paragraphs 7 and 9 of the settlement document, that his separation of employment from the Company[3] would be effective upon his execution of the settlement agreement and that he would withdraw and obtain dismissal with prejudice of any charges filed with any court or administrative agency against the Company and related individuals.

Petitioners filed joint Forms 1040, U.S. Individual Income Tax Return, for 1997 and 1998. On their 1998 return, petitioners did not report as income the $30,000 settlement payment designated as compensation for emotional distress. On January 3, 2002, respondent issued to petitioners the notice of deficiency underlying the instant proceeding, in which respondent determined, inter alia, that the $30,000 payment was taxable to petitioners.

## Discussion

### I. Burden of Proof

In general, the Commissioner's determinations are presumed correct, and the taxpayer bears the burden of proving otherwise. Rule 142(a). Section 7491, effective for court proceedings that arise in connection with examinations commencing after July 22,

---

[3] Hereinafter, for convenience, we adopt the terminology of the settlement agreement and refer to Massachusetts Mutual Life Insurance Company as the Company.

1998, however, may operate in specified circumstances to place the burden on the Commissioner. Internal Revenue Restructuring & Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727. With respect to factual issues and subject to enumerated limitations, section 7491(a) may shift the burden of proof to the Commissioner in instances where the taxpayer has introduced credible evidence. Concerning penalties and additions to tax, section 7491(c) places the burden of production on the Commissioner.

Although the record in this case is not explicit as to when the underlying examination began, it is clear that, at least with respect to 1998, section 7491 would be applicable. In any event, respondent conceded at trial that section 7491 likely applied to this matter. Nonetheless, the Court finds it unnecessary to decide whether the burden should be shifted under section 7491(a). The record in this case is not evenly weighted and enables us to render a decision on the merits based upon a preponderance of the evidence, without regard to burden of proof.

## II. Section 104(a) Exclusion

### A. General Rules

As a general rule, the Internal Revenue Code imposes a Federal tax on the taxable income of every individual. Sec. 1. Section 61(a) specifies that "Except as otherwise provided", gross income for purposes of calculating such taxable income

means "all income from whatever source derived".  The boundary of this definition is broad, typically reaching any accretions to wealth.  <u>Commissioner v. Schleier</u>, 515 U.S. 323, 327 (1995); <u>Commissioner v. Glenshaw Glass Co.</u>, 348 U.S. 426, 429-431 (1955).

Section 104, in contrast, provides otherwise by authorizing an exclusion with respect to compensation for injuries or sickness.  Such exclusions from gross income are construed narrowly.  <u>Commissioner v. Schleier</u>, <u>supra</u> at 328; <u>United States v. Burke</u>, 504 U.S. 229, 248 (1992) (Souter, J., concurring in judgment).  As amended on August 20, 1996, by the Small Business Job Protection Act of 1996 (SBJPA), Pub. L. 104-188, sec. 1605, 110 Stat. 1838, and as applicable to this case, section 104 reads in pertinent part as follows:

SEC. 104.  COMPENSATION FOR INJURIES OR SICKNESS.

(a) In General.--Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include--

\* \* \* \* \* \* \*

(2) the amount of any damages (other than punitive damages) received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness;

\* \* \* \* \* \* \*

\* \* \* For purposes of paragraph (2), emotional distress shall not be treated as a physical injury or physical sickness.  The preceding sentence shall not apply to an

amount of damages not in excess of the amount paid for medical care * * * attributable to emotional distress.

Legislative history accompanying passage of the SBJPA additionally clarifies that "the term emotional distress includes symptoms (e.g., insomnia, headaches, stomach disorders) which may result from such emotional distress."  H. Conf. Rept. 104-737, at 301 n.56 (1996), 1996-3 C.B. 741, 1041.

Regulations promulgated under section 104 further define "damages received (whether by suit or agreement)" as "an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution."  Sec. 1.104-1(c), Income Tax Regs.

Prior to the SBJPA, section 104 authorized exclusion of damages received on account of "personal injuries or sickness", which embraced "nonphysical injuries to the individual, such as those affecting emotions, reputation, or character".  United States v. Burke, supra at 235 n.6; see also Commissioner v. Schleier, supra at 329-331.  Interpreting that regime, the U.S. Supreme Court in Commissioner v. Schleier, supra at 336-337, established a two-pronged test for ascertaining a taxpayer's eligibility for the section 104(a)(2) exclusion.  As stated by the Supreme Court:  "First, the taxpayer must demonstrate that the underlying cause of action giving rise to the recovery is 'based upon tort or tort type rights'; and second, the taxpayer

must show that the damages were received 'on account of personal injuries or sickness.'" Id. at 337. This test has since been extended to apply to the amended version of section 104, with the corresponding change that the second prong now requires proof that the personal injuries or sickness for which the damages were received were physical in nature. See, e.g., Venable v. Commissioner, T.C. Memo. 2003-240, and cases cited therein.

B. Analysis

1. Tort or Tort Type Rights

As indicated above, the first requirement for the section 104(a)(2) exclusion is that the claim underlying the funds received must be based on tort or tort type rights. Commissioner v. Schleier, supra at 337. A "tort" is defined as a "'civil wrong, other than breach of contract, for which the court will provide a remedy in the form of an action for damages.'" United States v. Burke, supra at 234 (quoting Prosser and Keeton on the Law of Torts 2 (1984)).

Where amounts are received pursuant to a settlement agreement, the nature of the claim that was the actual basis for the settlement controls excludability. Stocks v. Commissioner, 98 T.C. 1, 10 (1992); Metzger v. Commissioner, 88 T.C. 834, 847 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988). The claim must be bona fide, but it need not be sustainable or valid. Taggi v. United States, 35 F.3d 93, 96 (2d

Cir. 1994); <u>Stocks v. Commissioner</u>, <u>supra</u> at 10; <u>Metzger v. Commissioner</u>, <u>supra</u> at 847. The claim additionally need not have been asserted prior to the settlement, but lack of knowledge of the claim on the part of the payor may indicate a lack of intent to settle such a claim. <u>Gajda v. Commissioner</u>, T.C. Memo. 1997-345, affd. 158 F.3d 802 (5th Cir. 1998); <u>Brennan v. Commissioner</u>, T.C. Memo. 1997-317.

The parties here have not addressed whether the claim or claims underlying the settlement sound in tort. Rather, they have focused on whether the $30,000 payment was received on account of physical injury. This emphasis may in large part be due to the fact that the complaint filed in the District Court action, which provided a principal impetus for the settlement at issue, is not in the record. Hence, while the parties stipulated generally that the complaint alleged a history of discrimination "based on Title VII of the Civil Rights Act of 1964, as amended", it is not possible to ascertain from the evidence what particular claims Mr. Oyelola may have asserted or whether he advanced a multiplicity of legal theories.[4] In these circumstances, and

---

[4] We note that the Supreme Court in <u>United States v. Burke</u>, 504 U.S. 229, 241 (1992), held that a claim premised on Title VII of the Civil Rights Act of 1964, prior to its amendment in 1991, was not based on tort or tort type rights. The Supreme Court also ruled in <u>Landgraf v. USI Film Prods.</u>, 511 U.S. 244, 282, 286 (1994), that the 1991 amendments to Title VII did not apply to conduct occurring before Nov. 21, 1991. As will be detailed more fully <u>infra</u> in text, petitioners place significant reliance on an
(continued...)

because a ruling on the physical injury question will be sufficient to resolve the instant case, we shall follow the lead of the parties and restrict our analysis to the second prong of the test for exclusion under section 104(a)(2).

2.   On Account of Personal Physical Injuries

As previously discussed, section 104(a)(2) sanctions exclusion of payments received "on account of personal physical injuries or physical sickness".  This phraseology reflects that excludability depends not only on the nature of the injuries but also on the purpose of the payment.  Accordingly, in the context of settlement payments, "the critical question is, in lieu of what was the settlement amount paid."  Bagley v. Commissioner, 105 T.C. 396, 406 (1995), affd. 121 F.3d 393 (8th Cir. 1997).  This is a factual inquiry involving consideration of all facts and circumstances surrounding the settlement.  Id.

The Court has summarized the role in this calculus of payment allocations set forth in a settlement agreement:

> Where there is an express allocation contained in
> the agreement between the parties, it will generally be
> followed in determining the allocation if the agreement
> is entered into by the parties in an adversarial
> context at arm's length and in good faith.  However, an
> express allocation set forth in the settlement is not
> necessarily determinative if other facts indicate that
> the payment was intended by the parties to be for a
> different purpose.  [Id.; citation omitted.]

---

[4](...continued)
incident taking place in March of 1991 to support their request
for exclusion under sec. 104(a)(2).

Stated conversely, "If the settlement agreement lacks express language stating that the payment was (or was not) made on account of personal injury, then the most important fact in determining how section 104(a)(2) is to be applied is 'the intent of the payor' as to the purpose in making the payment." Metzger v. Commissioner, supra at 847-848 (quoting Knuckles v. Commissioner, 349 F.2d 610, 613 (10th Cir. 1965), affg. T.C. Memo. 1964-33).

Here, the settlement agreement explicitly designated the disputed $30,000 amount as "compensation for emotional distress". Section 104(a) states unequivocally that "emotional distress shall not be treated as a physical injury or physical sickness", except for amounts actually paid for medical care attributable to the emotional distress. Essentially, then, our query is whether the circumstances of this case afford any justification for a departure from the result otherwise directed by the face of the settlement document.

At the outset, we note that the record is nearly devoid of information regarding the negotiations that led to the settlement agreement. However, nothing suggests that the context was other than adversarial and arm's length. The settlement was reached during the pendency of a filed legal action, and both sides were

apparently represented by counsel.[5]  Additionally, the agreement

was very specific as to the allocation of each portion of the

monetary award.  Out of a total of $187,824, only $30,000 was

designated for personal injuries, and that amount was explicitly

for emotional distress.  This then would not seem to be a

situation where one party's tax considerations were allowed to

take precedence over the actual nature and significance of the

various underlying claims.

Petitioners nonetheless argue on brief as follows:

The petitioners stated and provided evidence to the
Court that payments [sic?] of $30,000.00 was as a
result of physical damage to the lips, sustained as a
result of years of racial and national origin
harassment in the course of his employment at the
Connecticut Mutual Life Insurance Company.  Medical
papers were also presented from Rockville General
Hospital and the Institute of Living Medical Group,
P.C., substantiating the period, which pre-date the
emotional distress treatment.

The petitioners asked the Court to disallow the
$30,000.00 as taxable, given that emotional distress
cited in the "General Release, Confidential Separation
Agreement, Waiver and Covenant Not To Sue", resulted
from physical injury to the lips.  More so, the
complaint of the physical injury, to the CHRO, pre-
dates the payment of this $30,000.00, and pre date
[sic] treatment of the distress.

In summary, we would like the court to see that, **it was
the physical injury which was sustained at first, that
causes severe head ache, delusion, coupled with
sustained racial discrimination that led to my**

---

[5] Petitioners state in their trial memorandum that the
attorney who represented Mr. Oyelola in the civil rights action
has been disbarred from the practice of law in Connecticut and
cannot be located.

**emotional distress; hence, the treatments at the mental hospital: The Institute of Living.**

Petitioners therefore appear primarily to contend that, notwithstanding the language of the settlement agreement, the $30,000 amount was in fact paid on account of a physical injury. That injury was allegedly sustained to Mr. Oyelola's lips, as a result of sleep walking brought on by the emotional distress ensuing from the claimed discrimination. Alternatively, petitioners seem to suggest that the lip injury, not the discrimination itself, was the root cause of the emotional distress. In making these arguments, petitioners emphasize that the lip injury was communicated to the Connecticut Commission on Human Rights and Opportunities in conjunction with Mr. Oyelola's 1996 complaint.

At trial, petitioners introduced into evidence a copy of a supplemental affidavit filed by Mr. Oyelola with the Connecticut Commission on Human Rights and Opportunities. The 30-page document contains a single paragraph discussing physical injury, specifically a March 14, 1991, incident involving harm to Mr. Oyelola's lips:

> 8.  My manager's constant remarks wore me down.  I lost a lost of sleep, and I hardly ate properly.  In 1990 [sic], during the course of this treatment, I had a heart failure one night and collapsed.  When I regained consciousness, I was in a pool of blood.  My two upper teeth pierced through my lower lip.  I was rushed to Rockville/Vernon Hospital emergency room (see attached hospital records as Exhibit A).  I

subsequently went to Enfield Special Clinic for stitches on my lip.

Petitioners testified to similar effect at trial, although the "heart failure" could not be corroborated, and introduced the referenced hospital records as an exhibit. The records show that petitioner was treated on March 14, 1991, at Rockville General Hospital for "LACERATION/WOUND CARE" and "SEVERE HEADACHE/DIZZINESS", and that he could return to work on March 17, 1991. Total charges of $749.24 were incurred and billed to Mr. Oyelola's insurance. The only other evidence offered by petitioners consists of records from the Institute of Living Medical Group, P.C., indicating that petitioner was evaluated and treated on various occasions in 1997 and 1998 for anxiety and delusions.

The foregoing record in this case does not support a conclusion that the $30,000 was paid on account of physical injury. The sole specific incident of physical injury argued by petitioners, the damage to Mr. Oyelola's lips, is not commensurate with a $30,000 payment. In contrast, Mr. Oyelola apparently waged a lengthy battle with stress, anxiety, and other emotional problems. The notes contained in the records from the Institute of Living Medical Group, P.C., indicate that the ongoing racial discrimination, not the single physical injury, was the primary source of Mr. Oyelola's emotional distress. While we do not dismiss the physical pain Mr. Oyelola experienced

as a result of his 1991 collapse, the evidence supports the conclusion that the 1998 settlement payment was in fact, as the settlement agreement stated, intended by the Company to compensate for the far more pervasive emotional distress.

Accordingly, the $30,000 is not excludable from income, except to the extent actually paid for medical care attributable to the emotional distress. Petitioners have not directed our attention to any particular amounts paid for such medical care. The only reference in the record to specific charges incurred for Mr. Oyelola's treatment is the $749.24 shown as billed to his insurance company in 1991. There is no indication that petitioners were ever held responsible for any of this amount. Additionally, as respondent points out on brief, it is noteworthy that the settlement designated $7,824 for the cost of COBRA insurance coverage, such that Mr. Oyelola's medical expenses and needs would appear to have been contemplated and provided for by means other than the $30,000 payment. We hold that the $30,000 is not excludable from gross income under section 104(a).

To reflect the foregoing and concessions made,

Decision will be entered
under Rule 155.