T.C. Memo. 2000-131

UNITED STATES TAX COURT

MADELINE A. COBLENZ AND WILLIAM J. MASON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22383-97.                    Filed April 11, 2000.

<u>William A. Roberts</u>, for petitioners.

<u>Wanda M. Cohen</u> and Russell S. Shieldes (specially
recognized), for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  For 1995, respondent determined a
deficiency of $88,497 in and an accuracy-related penalty of
$17,699 on petitioners' Federal income tax.  The issues for

decision are (1) whether $266,686[1] received by William J. Mason (hereinafter, petitioner) in connection with a settlement of a lawsuit should be excluded from gross income pursuant to section 104(a)(2); and (2) whether petitioners are liable for an accuracy-related penalty pursuant to section 6662(a).[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time they filed their petition, petitioners resided in Houston, Texas.

From 1977 to 1985, petitioner was a manager of various movie theaters. Towards the end of that period, petitioner met an individual involved in radio broadcasting. After this encounter, petitioner became interested in purchasing and upgrading a radio station.

---

[1] The record reflects that this amount comprises settlement proceeds of $550,000 net of attorney's fees and litigation expenses. In the notice of deficiency, respondent's determination did not include in income the entire $550,000, only the $266,686. At the end of the trial, pursuant to Rule 41(b), respondent orally moved to amend the pleadings to conform to the evidence (i.e., treating the settlement proceeds of $550,000 as income and the attorney's fees and litigation expenses as miscellaneous itemized deductions) and increase the deficiency. We denied respondent's motion.

[2] All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Acquisition of Radio Station

In late 1987, petitioner located a radio station in Beaumont, Texas, struggling financially and in bankruptcy. Petitioner developed a business plan for acquiring, upgrading, and profitably operating the radio station (the venture).

In December 1988, petitioner met Mark W. White, Jr. (Mr. White), a former Texas Governor, and discussed the venture. After their meeting, petitioner negotiated favorable contracts and organized Modern World Media, Inc. (Modern World) with Mr. White, to acquire the radio station.[3]  In the beginning of 1990, using his many contacts, Mr. White obtained bank financing for the venture from First City, Texas-Houston, N.A. (First City Bank).  As a condition for the financing, First City Bank required a letter of credit to secure $5.5 million in bank loans.

Mr. White introduced petitioner to various wealthy Texas business people.  Through these introductions, Mr. White and petitioner convinced H. Ross Perot (Mr. Perot) to commit a $2.5 million letter of credit for the venture through one of Mr. Perot's companies, Gnat Robot Corp.

During 1990, First City Bank advanced funds in an amount less than $5.5 million.  With the funds that Mr. White and petitioner received from First City Bank, they acquired the radio

---

[3]  Because Mr. White was seeking the Democratic nomination for the Texas governorship, Mr. White did not initially take an equity interest in Modern World.

station and made some minor improvements.  Because of the incomplete funding, the radio station did not begin operating profitably or generating cash-flows as projected by petitioner's business plan.

Lawsuit by Gnat Robot Corp. and Mr. Perot

By the end of 1990, Mr. Perot became concerned about his investment in the venture.  Gnat Robot Corp. subsequently requested Modern World to find someone else to provide a letter of credit.  In early 1991, Gnat Robot Corp. and Mr. Perot instituted a lawsuit against First City Bank, Modern World, Mr. White, Linda Gale White (Mrs. White),[4] and petitioner (collectively, defendants) to enjoin First City Bank from drawing upon the letter of credit and to award Gnat Robot Corp. and Mr. Perot a 100-percent equity interest in Modern World (Gnat lawsuit).  After Gnat Robot Corp. and Mr. Perot failed to obtain an injunction, First City Bank drew upon the letter of credit. Gnat Robot Corp. and Mr. Perot continued pursuing the Gnat lawsuit to recover the $2.5 million and to obtain the 100-percent equity interest in Modern World.  After a jury trial, the defendants were ordered jointly and severally to pay Gnat Robot Corp. and Mr. Perot $2.5 million plus interest.  Mr. White, Mrs. White, and petitioner were ordered to relinquish their equity

---

[4]  Mrs. White, Mr. White's spouse, was a part owner of Modern World and participated in the agreement with Gnat Robot Corp. with regard to the letter of credit.

interest in Modern World to Gnat Robot Corp. Before the judgment was entered against Modern World, Mr. and Mrs. White caused Modern World to seek bankruptcy protection.

During late 1991 and early 1992, several Texas newspapers reported the Gnat lawsuit. The newspaper headlines and underlying stories mostly described the Gnat lawsuit as a legal fight between Mr. White and Mr. Perot. Some of the articles, however, made references to petitioner. After the Gnat lawsuit, petitioner unsuccessfully attempted to raise venture capital to acquire other radio stations.

First City Bank Receivership

During 1992, the Federal Deposit Insurance Corporation (the FDIC) took control of First City Bank for reasons unrelated to the venture and established a receivership to liquidate its assets and pay off its debts. An entity, First City Liquidating Trust Loans, L.P. (FCLT), was created to receive any assets remaining after all debts had been paid and to distribute those assets to a corporation that had obtained the rights to those assets (purchasing corporation). The FDIC set aside $20 million of First City Bank's assets to create a reserve for claims against and litigation expenses incurred for First City Bank. Any funds remaining after the resolution of all claims against First City Bank were to be transferred to FCLT.

Petitioner's Administrative Claim Against the FDIC

On February 8, 1993, petitioner filed an administrative claim with the FDIC, as the receiver for First City Bank, in the amount of $3 million.  On July 13, 1993, petitioner amended his claim to $2.5 million plus interest.  On January 26, 1994, petitioner's claim was denied by the FDIC for failure to provide sufficient information to support a provable claim.

Petitioner's Complaints Filed in U.S. District Court

Petitioner retained the services of Leonard Simon (Mr. Simon), a commercial litigator and bankruptcy attorney, who evaluated several potential causes of action against the FDIC as receiver for First City Bank.  On March 28, 1994, petitioner filed a complaint against the FDIC alleging four causes of action:  (1) Count I:  Breach Of Warranty, (2) Count II:  Texas Deceptive Trade Practices - Consumer Protection Act, (3) Count III:  Tortious Interference, and (4) Count IV:  Conspiracy.  On August 18, 1994, petitioner filed an amended complaint alleging an additional cause of action entitled Count V:  Breach Of The Duty Of Care Owed By A Pledgee Of Stock.  We refer generally to petitioner's complaint and amended complaint as petitioner's lawsuit.

Petitioner's amended complaint contained a section entitled "The Facts" which recited relevant facts serving as the basis of

petitioner's lawsuit.  Petitioner alleged in "The Facts" that "First City [Bank] wrongfully demanded, and received, payment of $2,500,000, under * * * [Gnat Robot Corp.'s] letter of credit, and thereby triggered a sequence of events that deprived * * * [petitioner] of his ownership rights in * * * [Modern World] but left him indebted to third parties based on guarantees directly related to those ownership rights that were lost".

On the basis of "The Facts", in Count I, petitioner alleged that when First City Bank demanded payment on the letter of credit, it warranted to all interested parties that $2.5 million was due and payable by Modern World.  Petitioner further alleged that the $2.5 million was not due and payable and that therefore First City Bank's improper demand caused petitioner to lose his equity interest in Modern World.  As to Count II, he alleged that First City Bank violated certain provisions of the "Texas Deceptive Trade Practices - Consumer Protection Act", that First City Bank breached its warranty made to petitioner, and that First City Bank "engaged in an unconscionable course of action".  In Count III, petitioner contended that First City Bank's interference with petitioner's contractual relationship with Gnat Robot Corp. caused damages to petitioner, including the loss of his equity rights in Modern World.  In Count IV, petitioner alleged that First City Bank and Mr. White entered into a conspiracy to place Modern World in bankruptcy proceedings from

which Modern World did not financially recover.  Finally, in Count V, petitioner alleged that First City Bank "breached the duty of ordinary care that a creditor in possession of property securing a debt owes to the pledgor of such property".  As a result of First City Bank's breach, petitioner alleged that he lost the Modern World stock which he had pledged to First City Bank.  Petitioner sought actual and consequential damages, as well as attorney's fees, on account of these alleged causes of action.[5]

In his original and amended complaints, petitioner did not allege that First City Bank's actions damaged his business reputation.  Although Mr. Simon retained an appraiser to value petitioner's equity interest in Modern World, he did not hire an expert to value any harm to petitioner's business reputation.

Initial Offer of Settlement, Mediation, and Documents Filed With the U.S. District Court

On October 18, 1994, Mr. Simon made an initial offer of settlement to the FDIC.  Mr. Simon proposed that in settlement of petitioner's claims, the FDIC provide petitioner with a $750,000 payment or a $2 million loan for the purchase of another radio station.  The FDIC rejected Mr. Simon's offer.

In June of 1995, Mr. Simon contacted Pat Cantrell, a tax attorney, C.P.A., and former IRS revenue agent and Appeals

---

[5]  With regard to some counts, petitioner sought incidental, enhanced, and punitive damages.

officer (tax adviser), for advice regarding whether settlement proceeds in petitioner's lawsuit would be considered nontaxable income under the tax laws.

The litigation eventually proceeded to mediation. On July 20, 1995, Mr. Simon, petitioner, and representatives for the FDIC met before a mediator. Larry A. Thomas served as the lead attorney for the FDIC (the FDIC attorney). The mediation proved unsuccessful.

Before and after the mediation, the FDIC and petitioner filed various motions and documents with the U.S. District Court. On July 19, 1995, the FDIC filed a motion for summary judgment with regard to petitioner's amended complaint.[6] On July 25, 1995, petitioner filed a supplement to his amended complaint alleging that First City Bank participated in Mr. White's alleged breach of his fiduciary duties to petitioner. Petitioner alleged that his damages included the value of his Modern World stock at the time of First City Bank's wrongful conduct.[7] In motions to dismiss and for summary judgment, the FDIC vigorously contested both petitioner's claim that First City Bank caused him to lose

---

[6] The U.S. District Court granted the FDIC's motion for summary judgment with regard to Count II.

[7] The other damages alleged by petitioner consisted of any amounts the U.S. District Court might award First City Bank on its counterclaim against him. Based on this description of petitioner's damages, petitioner sought actual, punitive, or enhanced damages, court costs, and attorney's fees in the supplement to his amended complaint.

his equity interest in Modern World and petitioner's valuation of the equity interest. On August 1, 1995, petitioner moved for summary judgment with regard to certain causes of action in his lawsuit (cross motion for summary judgment). In that cross motion for summary judgment, petitioner alleged that his damages amounted to the value of his stock awarded to Gnat Robot Corp.

Final Settlement Discussions

After mediation failed, Mr. Simon and petitioner decided to negotiate with Bob Brown (Mr. Brown), who was in charge of FCLT. On August 29, 1995, prepared to make a detailed presentation regarding petitioner's claims, Mr. Simon and petitioner met briefly with Mr. Brown. Before the meeting, the FDIC had approved Mr. Brown's involvement in the settlement discussions. At the meeting, Mr. Brown only asked Mr. Simon and petitioner for a settlement figure. There were no discussions about the alleged causes of action in petitioner's lawsuit. The meeting lasted only 10 to 15 minutes, and they agreed that the FDIC, subject to its approval, would pay $550,000 to settle petitioner's claims (settlement offer).

FDIC Approval of the Settlement Offer

Mr. Brown, thereafter, notified the FDIC attorney of the settlement offer. On August 30, 1995, the FDIC attorney wrote a legal memorandum to an FDIC officer summarizing the facts involved in petitioner's lawsuit, analyzing each of petitioner's

remaining causes of action, and recommending the approval of the settlement offer. In a section entitled "AMOUNT OF CLAIM", the FDIC attorney stated that petitioner alleged that "he has been damaged in the amount of the value of his stock in the radio station asset". In a section entitled "CURRENT STATUS AND ESTIMATES", the FDIC attorney stated that "this is a complicated case involving many complex legal issues which could cause difficulty for a jury and, therefore, create uncertainty as to the outcome. It is clear that Mason plans to make an emotional argument to the jury claiming he was the innocent party and * * * [First City Bank] destroyed his dream of owning a radio station." The FDIC attorney, however, did not specifically address a harm to business reputation claim.

On August 31, 1995, the FDIC approved the settlement offer. Sometime after the FDIC approved the settlement, the FDIC attorney coordinated the drafting of a Mutual Settlement and Indemnification Agreement (settlement agreement). Before the drafting of the settlement agreement, the FDIC attorney was not aware of any claim by petitioner that First City Bank had harmed his business reputation. On September 8, 1995, the FDIC prepared a check in the amount of $550,000, payable to petitioner.

Drafting of the Settlement Agreement

The draft of the settlement agreement dated September 10, 1995, contained an introductory paragraph listing the parties

subject to the settlement agreement and its effective date, a "Recitals" section outlining relevant facts, and a "Consideration" section providing the benefits and obligations of each party. In the Consideration section, petitioner's attorneys included a statement that the settlement proceeds were in satisfaction of petitioner's claims for personal injuries, "within the meaning of title 26, section 104, of the United States Code", resulting from the alleged tortious conduct by First City Bank (the section 104 sentence).[8]

The FDIC attorney was surprised by the inclusion of the section 104 sentence. After reading section 104, the FDIC attorney concluded that only settlement proceeds on account of physical injuries were excluded from gross income. Therefore, he requested that the section 104 sentence be removed.

By September 12, 1995, the parties[9] produced a final draft of the settlement agreement (final settlement agreement). In the final settlement agreement, the section 104 sentence was removed. The Recitals section stated, among other things, that "Mason then commenced an action * * *, alleging various tort claims based on

_____

[8] Around this period in September 1995, Mr. Cantrell provided Mr. Simon an opinion that the settlement proceeds were nontaxable.

[9] Although FCLT, the purchasing corporation, and Madeline Coblenz (petitioner's wife) were not named parties in petitioner's lawsuit, the settlement agreement referred to them, in addition to the FDIC and petitioner.

the alleged misconduct of * * * [First City Bank] and alleging actual and consequential damages in an unspecified amount". Petitioner's attorneys requested that the language "Mason believes that * * * [First City Bank's] conduct damaged his business reputation" (business reputation sentence) be included in the Recitals section of the final settlement agreement. Because the FDIC attorney did not find petitioner's belief relevant, he permitted the inclusion of the business reputation sentence in the final settlement agreement.

In the Consideration section of the final settlement agreement, the parties released each other from any claims that each had against the other. With regard to the scope of the settlement agreement, however, the parties stated that the "release is limited to those claims, demands, rights and causes of action with respect to acts, omissions, transactions, practices, conduct, facts or circumstances arising from (1) the subject matter of the Recitals, (2) the subject matter of the Mason Lawsuit, (3) the Mason Note and (4) the Mason Guaranty" (scope provision). The scope provision similarly appeared in the September 10, 1995, draft of the final settlement agreement.

The parties did not allocate the $550,000 petitioner received from the FDIC (settlement proceeds) to any specific claim by petitioner. After attorney's fees and litigation expenses, petitioner received a net amount of $266,686.

OPINION

I.  <u>Evidentiary Issue</u>

Petitioners reserved relevance objections to Exhibits 42-R through 57-R.  The exhibits consist of court documents related to motions to dismiss and for summary judgment filed by the FDIC and petitioner in petitioner's lawsuit.  Rule 401 of the Federal Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence".  In order to be deemed relevant, proffered evidence need not prove an ultimate fact in issue; it must only tend to make the existence of any fact more or less probable.  Upon reviewing the exhibits to which petitioners' relevance objections are outstanding, we find those exhibits relevant within the meaning of rule 401, and thus petitioners' objections are overruled and the exhibits are hereby made a part of this record.

II. <u>Section 104(a)(2) Exclusion From Gross Income</u>

Under section 61(a), Congress has provided that gross income includes all income from whatever source derived unless otherwise excluded by the Internal Revenue Code.  See <u>Commissioner v. Glenshaw Glass Co.</u>, 348 U.S. 426, 429-430 (1955).  Pursuant to section 104(a)(2), gross income does not include "the amount of any damages received (whether by suit or agreement and whether as

lump sums or as periodic payments) on account of personal injuries or sickness".

The Secretary has interpreted "damages received" to mean amounts received "through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution".  Sec. 1.104-1(c), Income Tax Regs.  Therefore, to exclude damages from gross income pursuant to section 104(a)(2), the taxpayer must prove (1) the underlying cause of action is based upon tort or tort type rights; and (2) the damages received were on account of personal injuries or sickness.  See Commissioner v. Schleier, 515 U.S. 323, 337 (1995).  The term "personal injuries" has been interpreted as including nonphysical injuries such as those affecting emotions, reputation, or character.[10]  See United States v. Burke, 504 U.S. 229, 235 n.6 (1992).  This Court has in certain circumstances concluded that damages received on account of harm to business reputation were received on account of personal injuries.  See, e.g., Threlkeld v. Commissioner, 87 T.C. 1294, 1308 (1986), affd. 848 F.2d 81 (6th Cir. 1988).

In evaluating whether amounts received pursuant to a

_____

[10]  Congress amended sec. 104(a)(2) in The Small Business Job Protection Act of 1996, Pub. L. 104-188, sec. 1605(a), 110 Stat. 1755, 1838, by limiting the exclusion, inter alia, to "personal physical injuries or physical sickness".  The amendment does not apply to the year before us and has no bearing on the instant case.

settlement agreement are excludable under section 104(a)(2), we look to the written terms of the settlement agreement to determine the origin and allocation of the settlement proceeds. See Metzger v. Commissioner, 88 T.C. 834 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988); Jacobs v. Commissioner, T.C. Memo. 2000-59. If the language in the settlement agreement is unclear about the claim subject to settlement or if the settlement agreement does not provide for any allocations, we must look to "'the intent of the payor' as to the purpose in making the payment." Metzger v. Commissioner, supra at 847-848; see also Robinson v. Commissioner, 102 T.C. 116, 127 (1994), affd. in part, revd. in part and remanded on another issue 70 F.3d 34 (5th Cir. 1995). We analyze the nature of the claim that was the basis for settlement, not the validity of the claim. See United States v. Burke, supra at 237; Fabry v. Commissioner, 111 T.C. 305 (1998). We ask ourselves "in lieu of what was the settlement amount paid?" Bagley v. Commissioner, 105 T.C. 396, 406 (1995), affd. 121 F.3d 393 (8th Cir. 1997). This involves a factual inquiry. See Fabry v. Commissioner, supra.

In the instant case, the litigants disagree as to the nature of the claim that was the actual basis for the final settlement agreement. Petitioners contend that petitioner alleged various causes of actions in his lawsuit against the FDIC which are

considered torts under Texas law, that petitioner incurred harm to his business reputation as a result of the alleged torts committed by First City Bank, that the harm to his business reputation was a personal injury, and that petitioner's lawsuit was settled on account of that personal injury. Respondent disagrees and asserts that petitioner's lawsuit was settled on account of petitioner's loss of the Modern World stock, an economic injury. We first discuss whether the settlement proceeds were received on account of a harm to business reputation claim and on account of personal injuries or sickness.

The parties executed a settlement agreement to settle petitioner's lawsuit. Within the scope provision of the final settlement agreement, the parties recited that the subject matter of the Recitals and petitioner's lawsuit served as the basis for the settlement. By reference to the Recitals section in the final settlement agreement and petitioner's amended complaint against the FDIC, the final settlement agreement covers both a claim of harm to business reputation and a loss of the Modern World stock, respectively. Because the final settlement agreement does not provide an allocation with regard to those claims, we look beyond the final settlement agreement to determine the intent of the payor in paying the settlement proceeds.

In reaching a settlement with the FDIC, petitioner and his

attorneys underwent various steps: (1) Filing an administrative claim, (2) filing a complaint in U.S. District Court, (3) participating in mediation, (4) filing various court papers, (5) pursuing settlement discussions, and (6) drafting a settlement agreement. We evaluate each step to determine whether the settlement proceeds paid by the FDIC were on account of petitioner's claim of harm to business reputation.

Petitioner filed an administrative claim with the FDIC which was subsequently dismissed. The record does not contain the administrative complaint filed by petitioner with the FDIC. As to the types of damages alleged by petitioner in the administrative complaint, an FDIC internal memorandum suggests that petitioner sought $2.5 million plus interest for the loss of his Modern World stock.

In his original and amended complaints in the U.S. District Court, petitioner never alleged that his business reputation was harmed. Instead, as to Counts I, III, and V in the amended complaint, petitioner claimed that First City Bank's actions caused him to lose his equity interest in Modern World. The remaining counts did not specify any damage resulting from harm to business reputation. Petitioners argue that as to all counts in petitioner's amended complaint, petitioner sought actual and consequential damages which included harm to business reputation. The language of the original and amended complaints and the

overall record do not support petitioner's argument.  See discussion infra.

The FDIC and petitioner proceeded to mediation after the filing of petitioner's lawsuit.  At trial in the present case, petitioner testified that his dream of owning a radio station was discussed during the mediation.  However, neither petitioner nor Mr. Simon testified that a claim of harm to business reputation was discussed during the mediation.  At trial in the present case, the FDIC attorney could not remember the claims made by petitioner during the mediation, but he did document petitioner's claims in a memorandum drafted after the mediation.  Nowhere in that memorandum did the FDIC attorney discuss that petitioner alleged that his business reputation was harmed.  On the contrary, the memorandum concentrated on petitioner's allegations regarding his lost equity interest in Modern World and the valuation of that ownership interest.

In documents filed with regard to motions to dismiss and for summary judgment, the FDIC never contested or addressed a harm to business reputation argument.  In fact, petitioner filed a cross motion for summary judgment in which he alleged that First City Bank's wrongful conduct caused him to lose his Modern World stock.

During the final settlement discussions with Mr. Brown, there were no discussions about petitioners' alleged causes of

action. The record reveals that the FDIC was first made aware of petitioner's harm to business reputation claim upon receipt of the September 10, 1995, draft of the settlement agreement. By that time, the FDIC had approved the settlement offer and prepared a check for petitioner. The FDIC attorney subsequently requested that the section 104 sentence be removed, and he only allowed the inclusion of the business reputation sentence because he did not view petitioner's belief as relevant.

Although we look to the FDIC's intent in settling petitioner's lawsuit, we note that Mr. Simon testified that he understood petitioner's story as "a loss of his business". He further testified that his initial legal theories "were all primarily tort related theories that dealt with the actions of First City [Bank] that resulted in a loss of petitioner's ability to ultimately own, operate, and reap the benefits of this radio station [referring to Modern World]". Mr. Simon hired an appraiser to make a valuation of the radio station and to compute the value of petitioner's equity ownership. Further, Mr. Simon testified that after the mediation, he and his associates reevaluated the case, and "[they] tried to just refocus on the point that Bill Mason had been damaged, that his reputation had been damaged, and that his life-long dream of owning a radio station had been foreclosed by the activities of First City [Bank]". During the final settlement discussions, however, in

Mr. Simon's and petitioner's meeting with Mr. Brown, there were no discussions regarding petitioner's alleged causes of action.

On the basis of the entire record, we conclude that the FDIC did not provide the settlement proceeds to petitioner on account of a harm to business reputation claim.[11] The record, instead, favors respondent's argument that the FDIC settled petitioner's lawsuit on account of his allegations that First City Bank's actions led to the loss of his Modern World stock. Because we decide against petitioners with regard to whether the settlement proceeds were received on account of harm to business reputation, we conclude that the settlement proceeds were not received on account of personal injuries or sickness. Accordingly, we need not address whether the underlying causes of action were based upon tort or tort type rights. Therefore, we sustain respondent's determination.

III. Section 6662(a) Accuracy-Related Penalty

Pursuant to section 6662(a), for the year in issue, respondent determined an accuracy-related penalty of 20 percent on the amount of the underpayment attributable to a substantial understatement of tax. In the alternative, respondent determined the accuracy-related penalty on the amount of the underpayment

---

[11] Petitioners argue that FCLT was the real payor of the settlement proceeds. While we disagree, we note that Mr. Simon and petitioner did not discuss petitioner's claims with Mr. Brown and that petitioners have failed to provide any credible evidence that Mr. Brown was aware of a harm to business reputation claim.

due to negligence or disregard of rules or regulations. Respondent's determinations are presumed to be correct, and petitioners bear the burden of proving that the accuracy-related penalty does not apply. See Rule 142(a).

A substantial understatement of tax is defined as an understatement of tax that exceeds the greater of 10 percent of the tax required to be shown on the tax return or $5,000. See sec. 6662(d)(1)(A). The understatement is reduced to the extent that the taxpayer has (1) adequately disclosed his or her position or (2) has substantial authority for the tax treatment of the item. See sec. 6662(d)(2)(B). Section 6662(c) defines "negligence" as any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and "disregard" means any careless, reckless, or intentional disregard.

Whether applied because of a substantial understatement of tax or negligence or disregard of the rules or regulations, the accuracy-related penalty is not imposed with respect to any portion of the understatement as to which the taxpayer acted with reasonable cause and in good-faith. See sec. 6664(c)(1). The decision as to whether the taxpayer acted with reasonable cause and in good-faith depends upon all the pertinent facts and circumstances. See sec. 1.6664-4(b)(1), Income Tax Regs. Relevant factors include the taxpayer's efforts to assess his

proper tax liability, including the taxpayer's reasonable and good-faith reliance on the advice of a professional such as an accountant. See id. Further, an honest misunderstanding of fact or law that is reasonable in light of the experience, knowledge, and education of the taxpayer may indicate reasonable cause and good-faith. See Remy v. Commissioner, T.C. Memo. 1997-72.

Petitioners' tax adviser testified at trial that he reviewed the pleadings in petitioner's lawsuit, the final settlement agreement, and the applicable tax law and discussed petitioner's lawsuit with Mr. Simon and petitioner before recommending to petitioners that the settlement proceeds were excludable under section 104(a)(2). The tax adviser made the recommendation around the time of the final settlement agreement and the filing of petitioners' 1995 tax return. After reviewing the entire record, we find petitioners' reliance on their tax adviser reasonable and in good-faith, and we conclude that the accuracy-related penalty should not be imposed in this case.

In reaching our holdings herein, we have considered all arguments made, and to the extent not mentioned above, we find them to be irrelevant or without merit.

To reflect the foregoing,

<u>Decision will be entered for respondent with respect to the deficiency and for petitioners with respect to the accuracy-related penalty</u>.